UNITED STATES of America, Plaintiff-Appellee,

v.

Keith Bryan WEBB, Defendant-Appellant.

No. 84–1268.

United States Court of Appeals, Fifth Circuit.

March 4, 1985.

Rehearing and Rehearing En Banc Denied April 29, 1985.

Keith Bryan Webb, pro se., and David Keltner, (court-appointed), Fort Worth, Tex., for defendant-appellant.

Edward C. Prado, U.S. Atty., Sidney Powell, Ricardo Gonzales, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before GOLDBERG, JOHNSON, and DAVIS, Circuit Judges.

JOHNSON, Circuit Judge:

Keith Webb was convicted of second degree murder in violation of 18 U.S.C. § 1111.[1] In addition, Webb was convicted of two counts of injury to a child in violation of 18 U.S.C. §§ 7 and 13 (the Assimilative Crimes Act)[2] and Tex.Penal Code Ann. § 22.04(a).[3] Webb appeals his convictions

---

[1] 18 U.S.C. § 1111 provides:

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States....

[2] The Assimilative Crimes Act consists of 18 U.S.C. §§ 7 and 13. Section 7 provides in pertinent part:

The term "... territorial jurisdiction of the United States", as used in this title, includes:

....

(3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

Section 13 provides in pertinent part:

Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

[3] Tex.Penal Code Ann. § 22.04 provides in pertinent part:

(a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that causes to a child who is 14 years of age or older:

(1) serious bodily injury;

(2) serious physical or mental deficiency or impairment;

(3) disfigurement or deformity; or

(4) bodily injury.

(b) An offense under Subsection (a)(1), (2), or (3) of this section is a felony of the first degree when the conduct is committed intentionally or knowingly. When the conduct is engaged in recklessly it shall be a felony of the third degree.

asserting that three confessions admitted at trial were obtained in violation of his fifth, sixth, and fourteenth amendment rights.[4] Finding merit to Webb's arguments, this Court holds that two of the three confessions were obtained in violation of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Accordingly, Webb's convictions are reversed, and the case remanded for a new trial.

## I. *Background*

Fort Bliss is a military reservation located in El Paso, Texas. June Webb was a soldier in the United States Army stationed at Fort Bliss at the time of the events in issue in this appeal. June Webb resided in military housing on the base, along with her putative husband Keith Webb, the defendant in this case.[5] Between one and two o'clock in the morning of September 6, 1983, June Webb and Keith Webb appeared at the Criminal Investigation Division (CID) office at Fort Bliss ostensibly to report that June Webb had been raped. Once June Webb was physically separated from Keith Webb in the CID office, June Webb asserted that Keith Webb had killed her son, Steve Marcel Wilson, some weeks earlier.

After obtaining further details from June Webb, the CID agents approached Keith Webb stating that they desired to question him about an alleged homicide. Keith Webb fled the CID office area into the dark, and the agents were unable to locate him. Approximately six hours later, the CID was notified that an unknown individual was on top of a communications tower near the CID office and was threatening to commit suicide. When the CID agents arrived at the tower they were able to identify the individual as Keith Webb.

Almost immediately upon being spotted by the CID agents, Webb shouted that if they would get his wife and a priest, he would tell them where the body was buried. Record Vol. 3 at 32–33; 55–56.

While on the tower, Webb threatened to commit suicide. Unable to persuade Webb to come down from the tower, the CID agents summoned an army psychiatrist and CID crisis negotiator. By means of a mechanical device known as a "cherry picker", the psychiatrist and negotiator were elevated to a position near the tower where they could communicate with Webb. Initially, Webb was much higher on the tower than the negotiators, but he eventually came down to their level. In order to take Webb's mind off his threatened suicide, and to talk Webb down from the tower, the negotiators engaged Webb in a continuing dialogue. While on the tower, Webb repeatedly confessed to the psychiatrist and negotiator, stating that he had bashed his son's head against a wall, that he had scalded his son, that his son had died, and that he had buried him in the desert. Neither the psychiatrist nor the negotiator gave Webb *Miranda* [6] warnings.

At approximately 10:00 a.m. Webb climbed down from the tower, was handcuffed and advised of his rights. Webb indicated that he wanted a lawyer before he would answer any questions. Webb was then taken to the CID office and allowed to see June Webb, as Webb had requested. Upon seeing her, Webb stated, "Well, if I'm going down, you're going down with me, so you might as well tell them you're a part of it." Record Vol. 3 at 58. Webb was then allowed to sleep on a couch.

---

**4.** In addition to challenging the admissibility of his confessions, Webb raises six other issues for review. Because this Court concludes that Webb is entitled to a new trial on the grounds that two of his confessions were erroneously admitted at trial, this Court need not reach any of the other issues presented.

**5.** June Webb and Keith Webb were not legally married. At a prior point in time, Keith Webb

was legally married to Robin Webb and never divorced her prior to "marrying" June Webb. June Webb, Keith Webb, Robin Webb, and children from both unions all resided in the same home on Fort Bliss.

**6.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

At 11:00 a.m. FBI agents arrived at the CID office.[7] Webb was again given *Miranda* warnings, and Webb for the second time requested counsel before answering questions. The FBI agents then left to conduct their initial investigation of the alleged homicide. At 1:55 p.m. the FBI agents returned to the CID office and formally arrested Webb. The FBI agents again advised Webb of his rights, and for the third time Webb requested an attorney. Webb was then taken to the FBI office, where he was fingerprinted, photographed, and advised of his rights. For the fourth time, Webb asked for an attorney. At each request for an attorney, the agents properly ceased questioning Webb. The FBI agents then booked Webb into the El Paso County Jail at approximately 3:00 p.m. on September 6, 1983. The booking card stated that Webb was charged with murder on a federal reservation.

The FBI agents returned to their office to prepare a complaint so that Webb could be presented to a magistrate that day. A complaint was presented to a magistrate at 5:15 p.m. that evening, but the magistrate found the complaint unacceptable. The magistrate directed the agents to redraft the complaint and present Webb at 11:00 a.m. the following day. Webb eventually was presented at the designated time on September 7, 1983.

Meanwhile, at the El Paso County Jail, Officer Simmons, the classification officer on duty, allowed Webb to make a telephone call and then gave Webb something to eat and drink. According to Simmons, in order to determine where in the jail population to place Webb, Simmons asked Webb, "[W]hat kind of shit did you get yourself into?" According to Simmons, Webb's surprising reply was: "I murdered my son and buried him in the desert." Simmons then asked Webb, "Don't you think it be better if he got a Christian burial?" Record Vol.

3 at 76, 80–82, 95, 98. And then Simmons further asked, "Would you like to talk to the people that brought [you] here?" Record Vol. 3 at 76, 90. Webb indicated that he did want to talk to the FBI agents. Simmons relayed this information to his superior officer. The FBI was contacted at about 4:15 p.m. and given the message that Webb wished to talk with them.

Two hours later the FBI agents arrived at the jail. The agents again advised Webb of his rights and asked him if he wanted to talk to them. Webb signed a form waiving his rights. After trying to explain where he had buried his son, Webb agreed to lead the agents to the grave. Webb was not questioned on the trip to the grave. Webb indicated where the agents should drive and stop the car; he then walked them to within a few feet of the grave. Webb identified the grave by stating, "There's Stevey."

On the way back to jail, Webb asked the agents what would happen next. The agents began explaining the procedures that would begin with Webb's appearance before the magistrate the next day. Webb, however, wanted to talk about the events leading up to the death of his son. Webb gave the agents a detailed explanation of how his son died, stating that he (Webb) had bashed the child's head against the wall until a soft spot in the skull developed. The child suffered seizures thereafter. Webb also admitted placing the boy in a tub of scalding water to punish the child. After that, the boy's legs began to peel, he became lethargic, and eventually he died. Webb then related how he had wrapped the boy's body in a brown blanket and buried the body in the desert.

At trial, Webb conducted his defense *pro se.* In representing himself, Webb asserted that his confessions were obtained in an unconstitutional manner.[8] Webb asserts

**7.** The FBI bears responsibility for investigating crimes by civilians on federal reservations, and for formally arresting any civilians in connection with such a crime. Record Vol. 3 at 50. This Court notes that at least three law enforcement agencies were involved in the investiga-

tion of this crime, and the detention of Webb. Many of the problems associated with this case result from the lack of communication and coordination among agencies.

**8.** This Court notes that Webb's appointed trial counsel acted only in an advisory capacity, and

that his confessions were obtained in violation of his fifth, sixth, and fourteenth amendment rights.[9] Webb urges that the confession on the tower was inadmissible because he was not given *Miranda* warnings by the psychiatrist or negotiator. Webb further asserts that the jailhouse confession was inadmissible, among other reasons, because it was obtained in violation of *Edwards*. Finally, Webb argues that testimony that he led the FBI agents to the grave, any statements made to the FBI, and his confession on the way back to jail are all inadmissible because (1) they are the fruit of illegal conduct, and (2) they were obtained in violation of his constitutional rights. This Court concludes that both the jailhouse confession and the later statements to the FBI were obtained in violation of *Edwards*. This Court also concludes that the admission of those statements at Webb's trial was not harmless error. Consequently, Webb's convictions must be reversed and the case remanded for a new trial.

## II. *Edwards v. Arizona*

In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court addressed the question of whether the fifth, sixth, and fourteenth amendments require suppression of post-arrest statements obtained after a defendant had invoked his right to consult with counsel before further interrogation. *Silva v. Estelle*, 672 F.2d 457 (5th Cir.1982). *See Jordan v. Watkins*, 681 F.2d 1067,

1073 (5th Cir.1982) (distinguishing a request at the initial appearance for appointed counsel to represent a defendant in further judicial proceedings from a request for counsel with respect to custodial interrogation). In *Edwards*, the Supreme Court held:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85 (footnote omitted).

Recently, the Supreme Court has described the inquiry necessary to determine whether *Edwards* has been violated:

> First, courts must determine whether the accused actually invoked his right to counsel.... Second, if the accused invoked his right to counsel, *courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.*

---

that Webb frequently refused to follow his counsel's advice. Furthermore, we commend the district court for its patient handling of this *pro se* case, and its attempt to assist Webb in presenting his defense. Webb is represented by counsel on appeal.

**9.** We dispose of this case under *Edwards*. Therefore, we decline to address the sixth amendment issues raised in this case. *See Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *See also Nix v. Williams*, —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). "The policies underlying the two constitutional protections are quite distinct," and "a suspect may waive his Fifth Amendment right to the advice of counsel in deciding to remain silent without waiving his Sixth Amendment

right to counsel." *United States v. Shaw*, 701 F.2d 367, 380 (5th Cir.1983) (citations and quotations omitted), *cert. denied*, —— U.S. ——, 104 U.S. 1419, 79 L.Ed.2d 744 (1984). In addition, the resolution of this case is based on the per se rule announced in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), rather than any violation of the fifth amendment. The Supreme Court has stated that *"Edwards* [like *Miranda* ] did not confer a substantive constitutional right that had not existed before; it 'created a protective umbrella serving to enhance a constitutional guarantee.'" *Solem v. Stumes*, —— U.S. ——, 104 S.Ct. 1338, 1342 n. 4, 79 L.Ed.2d 579 (1984) (quoting *Michigan v. Payne*, 412 U.S. 47, 54, 93 S.Ct. 1966, 1970, 36 L.Ed.2d 736 (1973)).

*Smith v. Illinois,* — U.S. —, —, 105 S.Ct. 490, 493, 83 L.Ed.2d 488 (1984) (per curiam) (citations omitted and emphasis added). *See also Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

In the instant case, it is indisputable that Webb invoked his right to have counsel present during custodial interrogation. Webb made four unequivocal requests for counsel. Thus, in order for Webb's responses to further questioning to be admissible, the Government must show *both* that Webb initiated further discussions with Simmons and that Webb knowingly and intelligently waived the right to counsel that he had invoked. Simmons admittedly initiated the conversation with Webb. The Government attempts to remove Simmons' comments from the proscription of *Edwards* by arguing that Simmons' statements were not interrogation. The Government asserts Simmons' statements were merely administrative queries not barred by *Edwards.*

*Edwards* is an extension of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Supreme Court's interpretation of "interrogation" as used in *Miranda* provides the framework for determining whether Webb was interrogated for purposes of the per se rule in *Edwards.* In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 294 (1980), the Supreme Court discussed the meaning of "interrogation." The Court noted that interrogation was defined in *Miranda* as "*questioning initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added).

In *Innis,* the Supreme Court continued: This passage and other references throughout the opinion to "questioning" might suggest that the *Miranda* rules were to apply only to those police interrogation practices that involve express questioning of a defendant while in custody.

We do not, however, construe the *Miranda* opinion so narrowly.... The Court in *Miranda* also included in its survey of interrogation practices the use of psychological ploys, such as to "posi[t]" "the guilt of the subject," to "minimize the moral seriousness of the offense," and "to cast blame on the victim or on society." It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation.

*Innis,* 446 U.S. at 298–99, 100 S.Ct. at 1688–89 (citations and footnote omitted).

The Supreme Court concluded:

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the *term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.*

*Innis,* 446 U.S. at 300–301, 100 S.Ct. at 1689–90 (emphasis added and footnotes omitted).

The Supreme Court further instructs that the focus should be on the perceptions of the suspect, rather than the intent of the police. The police, however, are not to be held accountable for the unforeseeable results of their words or actions, and interrogation only extends to words or actions that the police *should have known* were reasonably likely to elicit an incriminating response. *Id.* Finally, the intent of the police is relevant to the inquiry only to the extent that it bears on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. *Innis,* 446 U.S. at 302 n. 7, 100 S.Ct. at 1690 n. 7.

The Government asserts that Simmons' question to Webb was merely an

administrative question which was attendant to custody, and therefore, exempted from the Court's definition of interrogation. The record, however, does not support this position. First, it is undisputed that Simmons knew that Webb had been charged with murder on a federal reservation. Second, the FBI agent that took Webb to the jail testified that he did not inform the classification officer of Webb's prior suicide threat. Third, another classification officer testified that it was not normal procedure to ask a defendant the charge against him since that information was on the booking card. Finally, Simmons testified that he saw his own role as one of helping in the FBI's investigation in whatever way he could. Given the facts of this case, we are inescapably led to the conclusion that Simmons' question to Webb was not a question normally attendant to custody such that it was not "interrogation." To the contrary, Simmons expressly questioned Webb, and that questioning falls within the Supreme Court's definition of interrogation. Moreover, even if no express questioning was involved, the entire episode, including the reference to a Christian burial, was reasonably likely to elicit an incriminating response, and Simmons should have known that such a response was reasonably likely.[10] This Court holds that Simmons' questioning constituted a police-initiated interrogation. Consequently, Webb's jailhouse statements were obtained in violation of *Edwards*, and should not have been admitted at Webb's trial.

■ After Webb's jailhouse statements, Simmons arranged for the FBI to be contacted. That communication indicated that Webb wished to speak with the FBI. FBI agents arrived at the jail two hours later and advised Webb of his rights. They then asked if Webb wished to speak with them. Webb waived his rights and led the agents to the grave. Subsequently, Webb gave a detailed confession. Our analysis of whether these actions and state-

ments by Webb were properly admitted at trial begins with the undisputed fact that the agents knew Webb had invoked his right to counsel before he was taken to the jail.

In *Smith v. Illinois*, the Supreme Court stated:

> *Edwards* set forth a "bright-line rule" that all questioning must cease after an accused requests counsel. In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching"—explicit or subtle, deliberate or *unintentional*—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance. With respect to the waiver inquiry, we accordingly have emphasized that a valid waver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation."

—— U.S. at ——, 105 S.Ct. at 494 (citations omitted and emphasis added).

The burden of proving that Webb waived his previously invoked right to counsel rests on the Government. *United States v. Charles*, 738 F.2d 686, 692 (5th Cir.1984). The Government has shown nothing more than that Webb responded to further FBI-initiated interrogation when the FBI arrived at the jail. The Government may have been operating erroneously under the assumption that Webb initiated the meeting, but the FBI was contacted as a result of Simmons' improper questioning of Webb. *Smith v. Illinois*, —— U.S. at ——, 105 S.Ct. at 494, clearly indicates that an unintentional violation of *Edwards* is a violation nonetheless. *Cf. Willie v. Maggio*, 737 F.2d 1372, 1384 (5th Cir.1984) (holding that if defendant initiates further interrogation with one law enforcement agency, interrogation by another agency absent actual knowledge of the defendant's initiation does not violate *Edwards*).

---

**10.** We need not, therefore, address whether this reference to a Christian burial amounted to a violation of the sixth amendment. *See Brewer*

*v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). *See supra* note 8 at 386.

Under *Edwards,* the accused must initiate further discussions with the law enforcement officers. Here, the Government was unable to demonstrate that Webb initiated the meeting. However innocent the FBI's violation of *Edwards, Edwards* was still violated when the FBI agents went to the jail to ask Webb whether he wished to speak with them. The damage had been done by Simmons, and this Court declines to hold that the jailhouse conversation, with its subtle psychological overreaching, amounts to an initiation by Webb of further discussions with the FBI. *Cf. Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 396, 74 L.Ed.2d 214 (1982) (by requesting a polygraph, defendant initiated further interrogation regarding the alleged crime).

That Webb executed a waiver of his right to counsel offers no help to the Government. This Court has no reason to doubt the district court's finding that Webb made a knowing, intelligent, and voluntary waiver of that right. The Supreme Court, however, has recognized that such a waiver does not cure a violation of *Edwards.*

> It does not in any way cast doubt on the legitimacy or necessity of *Edwards* to acknowledge that in some cases a waiver could be knowing, voluntary, and intelligent even though it occurred when the police recommenced questioning after an accused had invoked the right to counsel.

*Solem v. Stumes,* —— U.S. ——, 104 S.Ct. 1338, 1344, 79 L.Ed.2d 579 (1984).

■ *Edwards* created a per se rule which this Court has consistently followed. *See, e.g., United States v. Cherry,* 733 F.2d 1124, 1131 (5th Cir.1984); *Silva v. Estelle,* 672 F.2d 457 (5th Cir.1982). Once a defendant has invoked his right to counsel during interrogation, all further interrogation must cease. Only if the accused initiates further interrogation *and* there is a know-

ing and intelligent waiver, will subsequent statements made in response to police-initiated questioning be admissible at the accused's trial. The Government has demonstrated the knowing and intelligent waiver prong of *Edwards,* but it has failed to demonstrate that Webb initiated further interrogation. Consequently, Webb's statements should have been excluded at his trial. It is left to the district court to determine whether testimony regarding the body must be excluded in light of this opinion. Because the district court admitted Webb's statements, the issue of whether the physical evidence alone was admissible under some other theory was never presented at trial.[11]

### III. *Miranda v. Arizona*

■ Webb argues that the statements he made while on the tower should have been suppressed by the district court because he was not given *Miranda* warnings before the psychiatrist and negotiator engaged him in conversation. The Government contends that no warnings were required because Webb was not subjected to "custodial interrogation" as envisioned in *Miranda.* While the resolution of the *Edwards* issue mandates retrial in this case, this Court will address the admissibility of this initial confession in the interest of judicial economy.

In *United States v. Charles,* 738 F.2d 686, 692 (5th Cir.1984), this Court held that the defendant bears the burden of demonstrating that statements which the defendant seeks to suppress were made while the defendant was under custodial interrogation. We conclude that Webb has failed to demonstrate that the interchange among Webb, the psychiatrist, and the negotiator constituted interrogation.[12] Therefore, we

---

**11.** Webb makes a conclusional allegation that *Nix v. Williams,* —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), is inapplicable in this case. The Government presents no arguments on this issue at all.

**12.** Because this Court finds that under the present record Webb was not "interrogated," the

Court need not address whether Webb was "in custody." *Rhode Island v. Innis,* 446 U.S. at 298, 100 S.Ct. at 1688. *See also Berkemer v. McCarty,* —— U.S. ——, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *United States v. Henry,* 604 F.2d 908 (5th Cir.1979).

conclude that the statements Webb made while on the tower are admissible.

In *Miranda v. Arizona,* the Supreme Court held that certain procedural safeguards are necessary to protect a defendant's fifth and fourteenth amendment privilege against compulsory self-incrimination. 384 U.S. at 444, 86 S.Ct. at 1612; *Rhode Island v. Innis,* 446 U.S. at 297, 100 S.Ct. at 1688. Those procedural safeguards include the now familiar *Miranda* warnings. Statements obtained in violation of those requirements are not admissible in court. *United States v. Ackerman,* 704 F.2d 1344, 1348 (5th Cir.1983).

*Miranda,* however, applies only to statements made in the course of custodial interrogation. *Innis,* 446 U.S. at 300, 100 S.Ct. at 1689. *Ackerman,* 704 F.2d at 1348. In *Innis,* the Supreme Court stated;

> [T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.

*Innis,* 446 U.S. at 300, 100 S.Ct. at 1689. Moreover, volunteered statements of any kind are not barred by the fifth amendment. *United States v. Ricardo,* 619 F.2d 1124 (5th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1980).

*Innis* defined interrogation as not only "express questioning, but also ... any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301, 100 S.Ct. at 1689–90. As to the subjective intent of the police, the Court stated:

> This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response.

*Innis,* 446 U.S. 301 n. 7, 100 S.Ct. at 1690 n. 7.

The facts of the present case present a unique situation and one which leads this Court to conclude that Webb was not interrogated on the tower for purposes of *Miranda.* Webb fled the CID office area immediately upon finding out that the officers wished to question him about a possible homicide. To escape the CID officers Webb climbed a communications tower. Webb was not under the control of the officers until almost 10 hours later when Webb finally climbed down from the tower.

While on the tower, Webb was threatening to commit suicide. To deal with the crisis Webb had created, the CID agents sought the help of an army psychiatrist and a trained CID negotiator. The psychiatrist testified that he initiated conversation with Webb for the sole purpose of preventing Webb from attempting suicide and talking Webb into coming down from the tower. The psychiatrist testified that he asked only broad open ended questions such as, "What's happening?" or "What's going on?" or "How do you feel?" Webb responded by repeatedly confessing. The psychiatrist testified that he attempted to get Webb to talk about other things, and not the death of his son. Nevertheless, Webb continued to dwell on the murder of his son. Clearly, the psychiatrist was not attempting to elicit an incriminating response from Webb, nor should he have known that his open ended questions would elicit an incriminating response.

Moreover, the psychiatrist in this case was not a law enforcement officer. Confessions to private individuals are not barred by *Miranda* absent government participation.[13] *See United States v. Rose,* 731 F.2d 1337 (8th Cir.1984) (statements to bondsman admissible); *United States v. Colvin,* 614 F.2d 44 (5th Cir.), *cert. denied,* 446 U.S. 945, 100 S.Ct. 2174, 64 L.Ed.2d 802 (1980) (statements to army social workers admissible in child abuse case); *United*

---

**13.** Webb failed to adduce any evidence describing the role of the CID negotiator. This Court declines to speculate on what, if anything, that officer did or said. Webb bears the burden of production on the suppression motion, and Webb has not met that burden.

*States v. Wilkinson,* 460 F.2d 725 (5th Cir. 1972) (statements to private investigator admissible). The psychiatrist involved testified that his only purpose in talking with Webb was to prevent his suicide and to talk him down from the tower. This is not to say that psychiatrists could not in some situations be construed as agents of the Government. For example, this is not a case where law enforcement officials have sent a private citizen into contact with the defendant for the purpose of eliciting incriminating information. Nor is it a case where a psychiatrist, appointed by the court to determine whether the defendant is competent to stand trial, later testifies against the defendant. *See Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). This Court concludes that, under the facts presented by the present record, the psychiatrist involved here was not required to give Webb *Miranda* warnings.

In *Innis,* the Supreme Court stated that " '[i]nterrogation', as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." 446 U.S. at 300, 100 S.Ct. at 1689. We find, in the limited context of this suicide attempt and resultant standoff between Webb and the police, that the element of compulsion envisioned by *Miranda* was not present. The open ended dialogue initiated by the psychiatrist, under the unique circumstances of this case, was not the type of words and actions that we believe was reasonably likely to elicit an incriminating response from Webb. We conclude that under the present record Webb's statements while on the tower were properly admitted because the need for *Miranda* warnings had not yet arisen.[14]

Webb also argues that the statements he made while on the tower were involuntary because he was intoxicated at the time he made the statements. The psychiatrist testified that Webb appeared intoxicated on alcohol and amphetamines when the psychiatrist first came in contact with Webb, but that the effects had worn off by the time Webb came down from the tower.

In *Townsend v. Sain,* the Supreme Court stated the standard under which to review a claim that a confession was involuntary due to intoxication:

> If an individual's "will was overborne" or if his confession was not "the product of a rational intellect and a free will," his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug induced statement.

372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963). Webb repeatedly confessed from the time he was spotted on the tower to the time he came down from the tower. The psychiatrist was convinced from his observations that Webb had "become sober" long before he came down from the tower. There is nothing in the record to demonstrate that Webb's statements were involuntary.

## IV. *Conclusion*

■ This Court holds that Webb's statements made while in the El Paso County Jail, along with those statements made later that evening to the FBI, should have been excluded at Webb's trial. This Court has reviewed these errors in light of the harmless error doctrine and the Court concludes that the error was not harmless. *See, e.g., Harryman v. Estelle,* 616 F.2d

---

**14.** This Court notes that the Supreme Court recently created a public safety exception to *Miranda. New York v. Quarles,* —— U.S. ——, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In *Quarles,* the Supreme Court stated: "We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.,* 104 S.Ct. at 2633. We need not

decide whether this exception to *Miranda* applies in the instant case because we conclude Webb was not interrogated. We note, however, that Webb's safety was of primary concern to the negotiators, and the negotiators primary purpose of preventing Webb's threatened suicide presents an analogous situation to *Quarles.* This Court is reluctant to force a choice between *Miranda* and the neutralizing of a crisis situation created by Webb's suicide threats.

870, 875–78 (5th Cir.1980) (en banc), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). Consequently, Webb's convictions are reversed, and the case remanded for a new trial.

REVERSED AND REMANDED.