[No. 13323–3–I. Division One. March 24, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. KEITH BRYAN WHEELER, *Appellant.*

---

*Paris K. Kallas* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Roland Nikles, Deputy,* for respondent.

SWANSON, J.—Keith Bryan Wheeler appeals his conviction for second degree burglary. Two probation revocations arising from that burglary conviction have been consolidated with this appeal.

Wheeler contends that police exceeded the permissible scope of a valid *Terry* investigatory stop when they frisked and handcuffed him and then transported him two blocks for a showup at the scene of a burglary. Wheeler also claims that admission of a statement made to police during questioning for a Personal Investigation Report (PIR) violated his right to remain silent. Finally, Wheeler assigns error to a cautionary jury instruction given over defense objections and to a jury instruction that failed to specify the underlying crime for the burglary charge. We affirm.

On the afternoon of October 7, 1981, Seattle police officers Donald Smith and Tim Moellendorf responded to a possible burglary on Cloverdale Street. Two residents had called 911 after observing suspicious circumstances. Beatrice Snyder had observed a man twice walk by on the street as though he were "checking out" the neighbor's house. A short time later, the same man returned with another man in a green and white car. Ms. Snyder watched as the two parked the car, got out, and darted into a neighbor's yard. Mary Dahlen, another neighbor, also called 911

at approximately the same time after seeing a man run past her window. As he ran, the man tossed some gloves into the yard and threw his jacket into the garbage can. He was then wearing a blue shirt with stripes.

Officers Smith and Moellendorf received a description of the suspects over the radio. Upon arriving at the scene, the officers were told that one of the suspects was several blocks away on Rainier Avenue. The officers drove several blocks and spotted a man, subsequently identified as the defendant in this case, Keith Bryan Wheeler, wearing a blue shirt with stripes. The man was perspiring and out of breath, as though he had been running.

The officers did not question Wheeler at this time, but advised him that he was being held on suspicion of burglary. He was frisked, handcuffed, and transported approximately two blocks in the police car to the scene on Cloverdale Street. As the officers returned with Wheeler, they were informed by officers at the scene that a burglary had taken place in the Aquino residence on Cloverdale. Ms. Dahlen identified Wheeler and his clothing. Wheeler was then arrested and informed of his rights.

Police at the scene detained Tony Smith, the driver of the green and white car, as he attempted to leave and then discovered the ransacked Aquino house. Although the owner of the house indicated that numerous items were missing, none of the items were found in Wheeler's possession. Police found various items stacked up by the door of the house as though ready to be picked up.

The following day, Detective Hill approached Wheeler and advised him again of his *Miranda* rights. Wheeler refused to initial the rights sheets but indicated that he understood his rights. Detective Hill then gathered information for the PIR, telling Wheeler that the information was necessary for arraignment. During the course of this questioning, Hill asked Wheeler if he knew Tony Smith, the codefendant. Wheeler denied knowing Smith. After completion of the PIR, Wheeler was asked whether he would make a statement and he refused.

The State charged Wheeler by information filed February 9, 1982, with second degree burglary. A jury trial commenced on May 25, 1982. Sometime during the first day of trial, Wheeler left the courtroom to go to the bathroom and never returned. The trial continued, and the jury returned a guilty verdict. Wheeler's explanation at trial, as given by his probation officer, was that he had accepted a ride to work from Smith and that Smith made a detour along the way to contact a drug dealer. When Wheeler discovered that the ostensible drug deal actually involved a burglary, he fled.

Sentencing was delayed until May 19, 1983, when Wheeler was again in custody. The judge imposed a 10-year sentence. At the same time, the court also revoked Wheeler's suspended sentence and probation in two prior cases because of the burglary conviction and because he had left the burglary trial.

I

When evaluating a *Terry* investigatory stop, *see Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), a court must make two inquiries: "First, was the initial interference with the suspect's freedom of movement justified at its inception? Second, was it reasonably related *in scope* to the circumstances which justified the interference in the first place?" *State v. Williams,* 102 Wn.2d 733, 739, 689 P.2d 1065 (1984). Wheeler concedes that the initial investigative stop by police was proper. We therefore must determine whether police exceeded the proper scope of the detention by frisking and handcuffing Wheeler and transporting him approximately two blocks to the scene of a possible crime for identification by a witness.

The permissive scope of a valid *Terry* investigatory stop depends on the facts of the specific case.

This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least

intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983).

█ Relying on federal law as well as on independent state constitutional grounds, our Supreme Court set forth three factors for a court to consider in assessing the scope of the intrusion: (1) the purpose of the stop; (2) the amount of physical intrusion upon the suspect's liberty; and (3) the length of time the suspect is detained. *Williams*, at 740. If police actions exceed the proper scope of a valid *Terry* stop, they can be justified only if supported by probable cause to arrest. *Williams*, at 741.

Courts in several jurisdictions have approved the transportation of suspects a short distance for purposes of identification. *See* 3 W. LaFave, *Search and Seizure* § 9.2, at 44 n.93 (1975) and cases cited therein. Courts in this state have not yet applied the *Williams* factors to the removal of a suspect from the location of an investigatory detention for purposes of a showup. However, this court on at least two occasions has found removal of a suspect from the location of an investigatory stop or continued detention for a showup to be consistent with the purposes of an investigatory stop. *See State v. Gardner*, 28 Wn. App. 721, 626 P.2d 56 (1981) (suspect taken six blocks to stolen vehicle); *State v. Walker*, 24 Wn. App. 823, 604 P.2d 514 (1979) (suspect detained in police car while victim came to identify). Application of the *Williams* guidelines to the case at bar supports the trial court's decision upholding the validity of the detention.

### PURPOSE OF THE STOP

In *Williams*, police stopped a vehicle leaving the location of a silent burglar alarm. The police frisked the suspect, advised him of his rights, and sequestered him in the police car before determining whether an actual burglary had occurred. The Supreme Court noted that the purpose of the stop was not related to the detention, because the police

did not question the suspect but held him while additional evidence was collected. *Williams,* at 740.

In the instant case, the police unit that detained Wheeler had not itself confirmed the existence of a crime at the time it transported him. However, the police unit at the scene confirmed the burglary virtually simultaneously with Wheeler's detention. The police transporting Wheeler to the scene were told of the confirmed burglary immediately upon their return. Moreover, in the present case, police suspicion had already focused on Wheeler, a circumstance termed "essential" in *Williams.* The police had been given eyewitness accounts of several suspicious activities. One witness had provided a specific description of the suspect and his clothing, and that description matched Wheeler.

### AMOUNT OF INTRUSION

Although police did not draw their guns as did the officer in *Williams,* the amount of intrusion in the present case was significant. The police frisked and handcuffed Wheeler for the ride back to the burglary scene.

■ The court in *Williams* observed that in the context of an investigatory detention "[d]rawn guns and handcuffs, generally, are permissible only when the police have a legitimate fear of danger." *Williams,* at 740 n.2. In a typical street encounter *Terry* does not permit a frisk based simply on a "generalized suspicion" that a suspect is dangerous. *See State v. Smith,* 102 Wn.2d 449, 453, 688 P.2d 146 (1984). This court has also observed that "[a]lthough, normally, handcuffing an individual is not within the scope of an investigative stop and *Terry* frisk, in appropriate cases handcuffing may be 'reasonable, as a corollary of the lawful stop.'" *State v. Wakeley,* 29 Wn. App. 238, 243 n.1, 628 P.2d 835 (1981) (quoting *United States v. Purry,* 545 F.2d 217, 220 (D.C. Cir. 1976)). Additional considerations arise, however, when a suspect is transported within the confines of a police car. Wheeler was frisked and handcuffed not because police believed Wheeler was dangerous but because such actions are standard procedure when a suspect is

transported. The police car in the instant case did not contain a screen. We recognize that such procedures constitute a significant intrusion upon a suspect's liberty. However, we find that they are reasonable in light of the legitimate concern for police safety that arises when a suspect is otherwise validly transported in a police car. *Cf. State v. Walker,* 24 Wn. App. 823, 604 P.2d 514 (1979).

### LENGTH OF DETENTION

The *Williams* court also emphasized the length of detention prior to Williams' arrest, which it estimated to be 35 minutes. *Williams,* at 741 n.4. The time in the present case was considerably shorter. Although the record is not completely clear, no more than 5 to 10 minutes elapsed between the time Wheeler was detained and the time he was identified by a witness and arrested.

 The investigative methods employed by the police during an investigative detention "should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer,* at 500; *Williams,* at 738. Wheeler contends that the police failed to use the least intrusive means possible when they transported him without questioning him. We disagree.

As the court in *State v. Gardner* observed in approving the transportation of a suspect six blocks to a stolen vehicle, "[p]rompt efforts at identification by a victim or witness and determination of the culpability or innocence of the person detained are appropriate factors in considering the reasonableness of the investigative technique." *Gardner,* at 727.

As LaFave has stated,

> it is not correct to assume that the intrusiveness of the suspect's detention may always be best limited by holding the suspect at the place of the stopping and then transporting victims and witnesses there. . . .
>
> While victims are being transported, considerations of convenience and safety for the detaining officers will reasonably require the suspect be placed in physical custody, either handcuffed in the back of a police unit

or held at the nearest police station. A second available police unit must be located and dispatched to the victim's residence, then returned to the suspect's place of detention. Thus, in terms of both manner and length of detention, the degree to which the freedom of a suspect is infringed will equal, if not exceed, that resulting from transporting the suspect to the victim.

3 W. LaFave, *Search and Seizure* § 9.2, at 44 (quoting *People v. Harris,* 15 Cal. 3d 384, 540 P.2d 632, 124 Cal. Rptr. 536 (1975) (Clark, J., dissenting)). In the present case, it is highly unlikely that "a few short questions" could have dispelled the officers' suspicions about Wheeler. The police had a specific clothing description that tied Wheeler to reported suspicious activities. Taking Wheeler to the scene two blocks away for identification, rather than prolonging the detention further at that spot for questioning that could be inconclusive at best, represented under the circumstances the least intrusive method of either confirming or dispelling the officers' suspicions.[1]

## II

Wheeler next contends the trial court erred by admitting a statement he made to police in response to questioning for a Personal Investigation Report. He asserts police violated his *Miranda* rights when they "sneaked in" a question that was not part of the PIR. In response to a question by

---

[1]The dissent implies that in most cases transportation of a suspect for purposes of a showup is within the valid scope of an investigatory detention only if police have confirmed the existence of an actual crime. Such a bright–line test raises several potential problems in light of the broad diversity of encounters that fall within an investigatory detention, and we decline to reach this issue.

Clearly, transportation of a suspect from place to place in search of a potential crime is improper. *See, e.g., People v. Bloyd,* 416 Mich. 538, 331 N.W.2d 447 (1982) (police transported suspect to two nearby businesses to ascertain whether a crime had been committed). In the instant case, the police unit that detained Wheeler was one of the two responding to a suspected burglary. Confirmation of a crime by one unit occurred virtually simultaneously with Wheeler's detention by the other. We today decide only that the specific circumstances tying Wheeler to two reports of suspicious activities, as well as the short time and distance involved, justified transportation of Wheeler as part of an ongoing, valid investigatory detention.

Detective Hill, Wheeler denied knowing Tony Smith, the codefendant. The trial court subsequently admitted Wheeler's denial, finding it was "freely given, with full knowledge of the defendant's constitutional rights." We find that Wheeler voluntarily and knowingly waived his *Miranda* rights with regard to this statement and that it therefore was properly admitted.

Once an individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona,* 384 U.S. 436, 473–74, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). Under certain circumstances, however, police may resume questioning even though the accused has asserted his or her right to remain silent. The admissibility of statements obtained in this manner depends on whether the police have "scrupulously honored" the defendant's "right to cut off questioning." *Michigan v. Mosley,* 423 U.S. 96, 104, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975).[2] *See also State v. Cornethan,* 38 Wn. App. 231, 684 P.2d 1355 (1984); *State v. Mason,* 31 Wn. App. 41, 639 P.2d 800 (1982).

▆ To establish the waiver of a *Miranda* right, the State must demonstrate by a preponderance of the evidence that the waiver is a voluntary, knowing, and intelligent relinquishment of a known right. *State v. Kaiser,* 34 Wn. App. 559, 563, 663 P.2d 839 (1983) (citing *Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981)). The waiver of a *Miranda* right may be inferred from the circumstances, *see North Carolina v. Butler,* 441 U.S. 369, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979), and may be found when the defendant freely and selectively

---

[2]The *Mosley* Court rejected the contention that assertion of *Miranda* rights precluded any resumption of questioning unless counsel was present:

[C]learly the Court in *Miranda* imposed no such requirement, for it distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that "the interrogation must cease until an attorney is present" only "[i]f the individual states that he wants an attorney." 384 U. S., at 474.

*Mosley,* at 104 n.10.

responds to police questioning after initially asserting his rights. *State v. Coles,* 28 Wn. App. 563, 567, 625 P.2d 713 (1981).

Factors "relevant" to the validity of a waiver of a previously asserted right to remain silent are (1) whether the right to cut off questioning was scrupulously honored; (2) whether the police engaged in further words or action amounting to interrogation before obtaining a valid waiver; (3) whether the police engaged in tactics that tended to coerce the suspect to change his mind; and (4) whether the subsequent waiver was knowing and voluntary. *See State v. Robtoy,* 98 Wn.2d 30, 37 n.1, 653 P.2d 284 (1982).

At the time of his arrest on October 7, 1981, Wheeler was advised of his *Miranda* rights; Wheeler asserted his rights at that time and no interrogation occurred. The next day, Detective Hill approached Wheeler and repeated the *Miranda* warnings prior to asking the "descriptive and biographical" questions necessary for the PIR. Although Wheeler refused to sign the rights form and give a statement, he told Detective Hill that he understood his rights.

A review of the record convinces us that police scrupulously honored Wheeler's right to cut off questioning. Prior to initiating the PIR session, Detective Hill readvised Wheeler of his right to remain silent and Wheeler acknowledged his understanding of those rights. The record provides no basis for Wheeler's assertion that he mistakenly thought he had to answer these questions.

Police questioning for the PIR was not inconsistent with Wheeler's assertion of his *Miranda* rights the day before. Wheeler objects solely to the one question regarding the codefendant. Although Detective Hill testified that the question was not part of the PIR, police did not pursue any further questioning following Wheeler's denial. Generally, the type of questions required for a PIR are lawful even absent *Miranda* warnings. *See* 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.7, at 504 (1984). After completion of the PIR and Wheeler's refusal to give a statement, no further questioning took place. "This is not a case, there-

fore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Mosley*, at 105–06. *See also State v. Vannoy*, 25 Wn. App. 464, 610 P.2d 380 (1980); *State v. Boggs*, 16 Wn. App. 682, 559 P.2d 11 (1977).

We find that the State has sustained its burden to show that Wheeler intelligently and voluntarily waived his *Miranda* rights with regard to his denial of knowing the codefendant. Admission of the statement was therefore proper.

### III

We decline Wheeler's invitation to adopt a rule that as a matter of state constitutional law, the giving of the following cautionary instruction, absent defense request or consent, constitutes reversible error: "The fact that the defendant has not testified must not be considered by you in arriving at your verdict." Wheeler asserts that this instruction highlighted the fact that he had absented himself from the area during trial.

Jury instructions that draw inferences from a defendant's failure to testify violate the privilege against self–incrimination guaranteed by the fifth and fourteenth amendments of the United States Constitution. *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965). A cautionary instruction, even given over defense objections, does not violate this privilege as a matter of federal law. *Lakeside v. Oregon*, 435 U.S. 333, 55 L. Ed. 2d 319, 98 S. Ct. 1091 (1978). Each state, however, is free to forbid such an instruction as a matter of state law. *Lakeside*, 435 U.S. at 340. To date, Washington courts have not explicitly endorsed the *Lakeside* rule, although at least one court has applied the *Lakeside* reasoning to a different type of jury instruction. *See State v. Fletcher*, 30 Wn. App. 58, 62, 631 P.2d 1026 (1981) (instructing jury over defense objections that evidence may be used only for limited purposes did

not violate defendant's rights).

Washington courts have not addressed directly the issue raised by Wheeler and his citation to *State v. East*, 3 Wn. App. 128, 474 P.2d 582, *review denied*, 78 Wn.2d 995 (1970), in support of his position, is misplaced. In fact, *East*, although containing dicta both for and against Wheeler's position, stands more for the proposition that the giving of the cautionary instruction over defense objections is best left within the trial judge's discretion. The court cites with approval the following remarks of Judge Friendly in *United States v. Garguilo*, 310 F.2d 249, 252 (2d Cir. 1962):

> It is far from clear that such an instruction is prejudicial to a defendant; the chances are rather that it is helpful. The jurors have observed the defendant's failure to take the stand; in the absence of instruction, nothing could be more natural than for them to draw an adverse inference from the lack of testimony by the very person who should know the facts best. And "despite the vast accumulation of psychological data, we have not yet attained that certitude about the human mind which would justify . . . a dogmatic assumption that jurors, if properly admonished, neither could nor would heed the instructions of the trial court that the failure of an accused to be a witness in his own cause 'shall not create any presumption against him.'"

*State v. East, supra* at 133.

We are equally unpersuaded by Wheeler's reliance on the Washington Constitution. Article 1, section 9 (privilege against self–incrimination) is similar to the Fifth Amendment provision and should be given the same interpretation. *State v. Foster*, 91 Wn.2d 466, 473, 589 P.2d 789 (1979). *Lakeside* should therefore control. Const. art. 4, § 16 mandates that judges not comment on the evidence but declare the law. In this case, the disputed instruction briefly and accurately stated the law. The issue itself was raised by defendant's own actions in leaving during the course of the trial. Moreover, the instruction was not a

comment because it provides no indication of the judge's belief or disbelief in the evidence. *State v. Goldstein,* 65 Wn.2d 901, 902, 400 P.2d 368, *cert. denied,* 382 U.S. 895 (1965).

Finally, Wheeler's contention is particularly inappropriate in light of the circumstances faced by the trial judge below. Sometime during the first day of trial Wheeler left the courtroom and did not return. This placed the trial judge in somewhat of a dilemma. It would be naive to suggest that the jury was not fully aware of the defendant's sudden absence. The judge's failure to give the instruction under such circumstances could leave the decision open to a charge of inadequate assistance of counsel. The giving of the instruction may well have prevented the jury from drawing improper inferences.

In any event, we find that the circumstances of the trial below demonstrate the propriety of leaving the giving of this cautionary instruction within the sound discretion of the trial court. That trial court did not abuse that discretion in this case.

## IV

Wheeler's final contention is that the trial court erred by failing to instruct the jury on the specific crime underlying the burglary charge. Until recently, such a failure constituted reversible error. *See State v. Johnson,* 100 Wn.2d 607, 625, 674 P.2d 145 (1983). In *State v. Bergeron,* 105 Wn.2d 1, 15–16, 711 P.2d 1000 (1985), our Supreme Court overruled *Johnson* on this point, holding

> that the specific crime or crimes intended to be committed inside burglarized premises is *not* an element of burglary that must be included in the information, jury instructions or in the trial court's findings and conclusions.

However, even under *Johnson,*[3] failure to specify the

---

[3] Wheeler was convicted in 1982, prior to the *Johnson* decision. This court has held that *Johnson* does not apply retroactively. *State v. Anderson,* 42 Wn. App. 659, 663, 713 P.2d 145 (1986).

underlying crime in a burglary prosecution may be harmless error:

> [f]ailure to specify and define the underlying crime in a burglary prosecution can affect the verdict only if the jury concludes there was some borderline conduct intended which it believes is, but which is actually not, a crime.

*Johnson,* at 627.

Evidence presented at trial established that someone had entered the Aquino house and had committed theft. Wheeler was observed several times "checking out" the victim's house on foot and in an automobile. He was seen going into the victim's yard and then running through a neighbor's yard while discarding clothing. Wheeler's explanation was that he accepted a ride to work from Tony Smith, but became scared and ran away from the scene when Smith's drug deal turned into a burglary. If the jury believed this story, there would have been no borderline conduct that it might mistakenly have concluded was a crime. Any error was therefore harmless.

Because we affirm Wheeler's burglary conviction, we also affirm his probation revocations.

The judgment of the trial court is affirmed.

COLEMAN, J., concurs.

RINGOLD, A.C.J. (dissenting)—The majority holds today that the officers did not exceed the permissible scope of an investigative stop by handcuffing and transporting the defendant, Keith Wheeler, to the scene of a possible crime before the officers knew that any offense had been committed. I am compelled by the Supreme Court's decision in *State v. Williams,* 102 Wn.2d 733, 689 P.2d 1065 (1984), to dissent.

The court in *Williams* reversed the trial court and the Court of Appeals, holding that the police had exceeded the proper scope of a *Terry*[4] investigative stop. The police were

---

[4]*Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

responding to a silent alarm located in a residence when they noticed a man attempt to drive away from the front of the house. The officers stopped the man and ordered him out of his car. *Williams,* at 735. The man was then searched, handcuffed, and placed in the backseat of one of the patrol cars. *Williams,* at 735. The officers then proceeded to investigate the house and determined that a burglary had occurred. *Williams,* at 735.

The Supreme Court reasoned that this stop exceeded the scope of a permissible *Terry* stop. *Williams,* at 741. The court reviewed three factors to determine whether the intrusion was so substantial that its reasonableness depended upon a finding of probable cause to arrest: "the purpose of the stop, the amount of physical intrusion upon the suspect's liberty, and the length of time the suspect is detained." *Williams,* at 740.

The court concluded in *Williams* that the purpose of the stop in that case was not related to the defendant's detention. The police did not ask the defendant any questions until after they ordered him out of the car, frisked him, handcuffed him, placed him in the squad car, investigated the house, and called for a canine unit. *Williams,* at 740. In the case at bench, when the officers stopped Wheeler they were unaware whether any offense had actually occurred; yet, they did not ask any questions before frisking him, handcuffing him, and transporting him to the scene of the alleged burglary.

The amount of physical intrusion here, as in *Williams,* was excessive. In *Williams,* the police could not articulate a reason for believing that the suspect was dangerous, nor did the suspect make any furtive gestures or violent responses. Wheeler gave the officers no reason to believe he was dangerous. That a person is suspected of committing a possible burglary, without more, is not sufficient to support an inference that the person is dangerous. *Williams,* at 740.

Few situations justify police intrusion on a citizen's privacy without the police immediately ascertaining the suspect's identity, purpose for being in the area, and possible

involvement in a crime. *Williams,* at 741. The officers stopping Wheeler were in radio contact with other police at the scene of the burglary. When Wheeler was stopped, however, no attempt was made to determine whether a burglary had occurred by radioing the police at the scene, and no questions were asked Wheeler concerning his identity or his reason for being in the vicinity. Instead, the officers frisked, handcuffed, and transported Wheeler to the scene before discovering whether a burglary had occurred. Under these circumstances, the stop exceeded the permissible scope of a *Terry* stop and was an unlawful seizure under the Fourth Amendment.[5]

In addition, this conclusion is independently required by article 1, section 7 of our state constitution.[6] "This provision differs from the federal constitution and provides heightened protection to our citizens' privacy rights." *Williams,* at 741–42. Where there is no probable cause to arrest a suspect and the intrusion on personal liberty is of the magnitude present here, the language of Const. art. 1, § 7 forbids police seizures of this nature. *See Williams,* at 742.

Consequently, the witness's identification of Wheeler after Wheeler was transported to the scene should be suppressed as the product of an unlawful seizure. *See Williams,* at 742.

Review granted by Supreme Court June 3, 1986.

---

[5]Another factor to be considered is the length of time involved in the stop. *State v. Williams,* 102 Wn.2d 733, 741, 689 P.2d 1065 (1984). Unlike *Williams,* where the stop took approximately 35 minutes, the initial stop here was relatively brief. The intrusion here, however, was magnified, because Wheeler was transported to another location.

[6]Const. art. 1, § 7 provides:
"§ 7 Invasion of Private Affairs or Home Prohibited. No person shall be disturbed in his private affairs, or his home invaded, without authority of law."