# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49924-0-II |
| Respondent, | |
| v. | |
| LESHAUN AYATTA ALEXANDER, JR., | UNPUBLISHED OPINION |
| Appellant. | |

LEE, A.C.J. — Leshaun Ayatta Alexander, Jr. appeals his convictions for first degree assault and first degree unlawful possession of a firearm. He argues that (1) the trial court should have suppressed evidence found inside of a vehicle in which he was a passenger because the responding officer did not have a sufficient factual basis to justify an investigatory *Terry*[1] stop, (2) the officer's actions exceeded the permissible scope of a *Terry* stop, and (3) the trial court abused its discretion in failing to provide the jury with an additional self-defense instruction during jury deliberations. In a statement of additional grounds (SAG), Alexander asks this court to review whether specific and articulable facts supported the officer's investigative *Terry* stop of the vehicle in which he was a passenger. We affirm.

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

FACTS

A.    THE INCIDENT

In the early morning hours of October 16, 2015, 911 began receiving reports of a shooting at a Tacoma gas station located on the northwest corner of Tacoma Mall Boulevard and South 84th Street. The first caller, C.D.,[2] reported at 3:50 AM that he had heard six to seven gun shots and saw people running toward a movie theater located south of the gas station across South 84th Street.

At approximately 3:52 AM, N.B. called 911 and reported that she had witnessed the shooting as she drove down South 84th Street. N.B. saw a black male shooting at another black male, who was running toward a casino located north of the gas station. N.B. described the shooter as possibly in his 20s, 5 feet 6 inches tall, thin, with dreadlocks, and wearing black pants and a hood over his head. N.B. reported that after the shooting, the shooter headed in the westbound direction of South 84th Street.

Officer Kevin Clark of the Lakewood Police Department responded to dispatch at 3:52 AM. and headed in the direction of the gas station. En route, Officer Clark received updates from the dispatch center through his radio. At 3:53 AM, a third caller, M.T., reported seeing two black males shooting at each other at the gas station. M.T. stated that one male was wearing a grey hoodie and dark pants and the other male was wearing all black. The male in the grey hoodie fled toward South 84th Street, while the male in all black fled toward the casino, possibly got inside a Chrysler Sebring, and then drove in the direction of the male fleeing on South 84th Street.

---

[2] Each of the callers provided their name and personal phone number during the call. We refer to the callers by their initials in order to protect their privacy.

Between 3:53 AM and 3:54 AM, the final caller, N.G., reported seeing a black male shooting at another black male at the gas station. One of the parties appeared to be running westbound on South 84th Street, while the other party did not appear to be going anywhere. N.G. described the shooter as 26 to 28 years old, 6 foot 2 inches tall, of medium build, and wearing a grey sweater.

Officer Clark arrived in the vicinity of the gas station at approximately 3:54 AM. As he approached, Officer Clark saw a black Dodge Durango leave the southern entrance of the gas station parking lot and head westbound on South 84th Street. Officer Clark observed two black males wearing dark clothing seated in the front seat of the Durango and another male in the back seat. Aside from the Durango, Officer Clark did not see anything else in the gas station parking lot. At that point, Officer Clark had information that two black males wearing dark clothing had been shooting at each other in the gas station parking lot. One of the males may have fled the scene in a grey Chrysler Sebring, while the other may have headed south in the direction of 84th Street. Officer Clark did not have any information that both males had left the scene and were no longer at the gas station.

Officer Clark decided to initiate a traffic stop and at 3:55 AM, radioed to dispatch that he was stopping the Durango. Other officers arrived and helped conduct a "high-risk traffic stop." 4 Verbatim Report of Proceedings (VRP) (Dec. 5, 2016) at 209. The occupants of the Durango were ordered to exit, frisked for weapons, handcuffed, read their *Miranda*[3] rights, and placed in the backseat of a patrol car. Officer Clark then returned to the Durango and observed a firearm underneath the front passenger seat of the Durango.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d. 694, (1966).

Alexander was identified as the backseat passenger of the Durango. After the investigation revealed other evidence linking Alexander to the shooting, the State charged Alexander with one count of first degree assault[4] and first degree unlawful possession of a firearm.[5] The State also charged Alexander with a firearm sentencing enhancement for the first degree assault charge.

B.    MOTION TO SUPPRESS

Alexander filed a pretrial CrR 3.6 motion to suppress the evidence found as a result of the stop of the Durango.[6] Alexander argued that Officer Clark did not have reasonable suspicion to justify the stop of the Durango because there were no articulable facts connecting the Durango to the shooting. Alexander also argued that even if the stop was valid, Officer Clark's actions exceeded the permissive scope of a *Terry*[7] stop.

At the suppression hearing, Officer Clark testified to the facts discussed above. The trial court ruled that Officer Clark's stop of the Durango was a lawful *Terry* stop to further investigate the shooting.

---

[4] A person is guilty of first degree assault if "with intent to inflict great bodily harm . . . [a]ssaults another with a firearm or any deadly weapon." RCW 9A.36.011(1)(a).

[5] A person is guilty of unlawful possession of a firearm if after having previously been convicted of a serious offense, that person "owns, has in his or her possession, or has in his or her control any firearm." RCW 9.41.040(1)(a).

[6] CrR 3.6 allows a criminal defendant to file a motion to suppress physical, oral, or identification evidence prior to trial.

[7] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

C.     RELEVANT PORTIONS OF TRIAL

     1.     Testimony Related to Self-Defense

At trial, Alexander asserted self-defense as an affirmative defense to the first degree assault charge. Alexander testified and admitted that he shot at a man named Atere Norman when Alexander saw Norman at the gas station on October 16. According to Alexander, Norman had repeatedly threatened his life in the weeks leading up to the shooting. Alexander shot at Norman because he believed, based on their history, that Norman was going to shoot him.

     2.     Jury Instructions on Self-Defense

The trial court provided the jury three self-defense instructions that Alexander had requested. The instructions provided:

Instruction No. 13

     It is a defense to a charge of Assault in the First Degree that the force used was lawful as defined in this instruction.

     The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured, and when the force is not more than is necessary.

     The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

     The State has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty as to this charge.

Clerk's Papers (CP) at 278.

Instruction No. 14

Necessary means that, under the circumstances as they reasonably appeared to the actor at the time, (1) no reasonably effective alternative to the use of force appeared to exist and (2) the amount of force used was reasonable to effect the lawful purpose intended.

CP at 279

Instruction No. 15

It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force.

The law does not impose a duty to retreat. Notwithstanding the requirement that lawful force be "not more than is necessary," the law does not impose a duty to retreat. Retreat should not be considered by you as a "reasonably effective alternative."

CP at 280.

After the jury began deliberating, they submitted a question to the trial court. The jury asked:

Based on previous events where lethal force was threatened by an individual, can solely the presence of the same individual be perceived as an immediate threat justifying lethal force as a proactive act of self defense[?]

CP at 288.

In response to this question, Alexander proposed that the trial court either instruct the jury to read the jury instructions they had been provided or to provide the jury a supplemental instruction. Alexander proposed the following supplemental instruction:

A person is entitled to act on appearances in defending himself, if he believes in good faith and on reasonable grounds that he is in actual danger of injury, although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.

CP at 261.

The trial court denied Alexander's request to submit the additional instruction. The trial court found that if it were to submit Alexander's proposed instruction in response to the jury's question, then the jury might believe it to be the answer to their question. Instead, the trial court instructed the jury "I am not able to answer this question for you. Please review to instructions 13, 14, 15." CP at 288.

The jury found Alexander guilty on all charges. Alexander appeals.

## ANALYSIS

A. OFFICER CLARK CONDUCTED A VALID INVESTIGATORY STOP

Alexander argues that the trial court erred when it concluded that Officer Clark had lawful authority to stop the Durango because there were no particular, articulable facts linking the Durango to the shooting. Alexander also argues that even if Officer Clark had reasonable suspicion to stop the Durango, Officer Clark's actions exceeded the scope of an investigative stop. We disagree.

1. Standard of Review

"In reviewing the denial of a motion to suppress, we review the trial court's conclusions of law de novo and its findings of fact used to support those conclusions for substantial evidence." *State v. Fuentes*, 183 Wn.2d 149, 157, 352 P.3d 152 (2015). However, "we will review only those facts to which error has been assigned." *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). If the defendant does not challenge the findings of fact, then we consider them verities on appeal. *State v. Bliss*, 153 Wn. App. 197, 203, 222 P.3d 107 (2009). We review conclusions of law from

an order denying a motion to suppress de novo. *State v. Mecham*, 186 Wn.2d 128, 137, 380 P.3d 414 (2016).

       2.      Reasonable Suspicion Supported the Stop

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution demand that an officer have a warrant before seizing an individual unless an exception to the warrant requirement applies. *State v. Weyand*, 188 Wn.2d 804, 811, 399 P.3d 530 (2017). One such exception allows an officer to conduct a brief investigative stop known as a *Terry* stop. *State v. Z.U.E.*, 183 Wn.2d 610, 617, 352 P.3d 796 (2015). A *Terry* stop is permissible if the "officer has a reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime." *State v. Acrey*, 148 Wn.2d 738, 747, 64 P.3d 594 (2003). Article I, section 7 of our state Constitution provides broader protections than the Fourth Amendment and generally requires that the available facts "substantiate more than a mere generalized suspicion that the person detained is 'up to no good.' " *Z.U.E.*, 183 Wn.2d at 618 (quoting *Bliss*, 153 Wn. App. at 204, 222). "[T]he facts must connect the particular person to the *particular crime* that the officer seeks to investigate." *Id.* (emphasis in original).

"When reviewing the merits of an investigatory stop, a court must evaluate the totality of circumstances presented to the investigating officer." *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991). Among the factors to consider when evaluating whether the stop was proper are the officer's training and experience, the location of the stop, and the conduct of the detainee. *Acrey*, 148 Wn.2d at 747. To an extent, reasonableness of the stop depends on the seriousness of

the suspected criminal conduct. *State v. McCord*, 19 Wn. App. 250, 253, 576 P.2d 892, *review denied*, 90 Wn.2d 1013 (1978).

Alexander argues that Officer Clark did not have specific and articulable facts connecting the Durango to the shooting because the witnesses reported that one shooter had fled the scene on foot, while the other had fled in a Chrysler Sebring. However, the final caller, N.G., reported that one of the shooters did not appear to be going anywhere.[8] Officer Clark arrived in the vicinity of the gas station as this final report was being relayed by dispatch, and he observed one vehicle at the scene, the Durango. The occupants of the Durango matched the limited physical description given by the various witnesses to the shooting. Given that Officer Clark was responding to an active shooting situation in which one of the shooters was reportedly still at the scene, Officer Clark had a reasonable suspicion that the only vehicle at the scene had been involved in the shooting. Based on the totality of the circumstances, Officer Clark had a sufficient factual basis to formulate a reasonable suspicion to stop the Durango.

3.      Scope of the *Terry* Stop

Alexander argues that even if Officer Clark had a reasonable suspicion to stop the Durango, the detention of its occupants exceeded the permissive scope of a valid investigatory stop and any evidence resulting from the stop must be excluded. We disagree.

Whether an officer has exceeded the scope of a *Terry* stop is a fact specific inquiry. *State v. Wheeler*, 43 Wn. App. 191, 195, 716 P.2d 902 (1986), *aff'd* 108 Wn.2d 230 (1987). The stop must last no longer than necessary and employ the least intrusive means available to verify or

---

[8] Alexander does not challenge any of the trial court's findings of facts in its CrR 3.6 order, including this finding. Therefore, it is a verity on appeal. *See Bliss*, 153 Wn. App. at 203.

dispel the reasonable suspicion. *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). Where the criminal conduct endangers life or personal safety, a greater intrusion is allowed. *McCord*, 19 Wn. App. at 253. An officer must release the individual if the initial results of the stop dispel the officer's suspicions, but results that confirm the suspicions, or arouse further suspicions, permit an extended seizure. *Acrey*, 148 Wn.2d at 747. Where officers believe that the suspect is armed, they may employ measures beyond a typical *Terry* stop, "such as handcuffing, secluding, and drawing guns. " *State v. Mitchell*, 80 Wn. App. 143, 145, 906 P.2d 1013 (1995), *review denied*, 129 Wn.2d 1019 (1996); *see e.g.*, *State v. Smith*, 67 Wn. App. 81, 88, 834 P.2d 26 (1992), *aff'd*, 123 Wn.2d 51 (1993).

Here, Officer Clark responded to a scene in which two individuals had reportedly fired several shots at one another. In the three minutes it took Officer Clark to arrive on scene, dispatch continued to receive reports of a shooter firing. And the last witness reported that one of the shooters appeared to remain at the scene. Thus, Officer Clark had a reasonable basis to believe one of the suspects was armed and, therefore, could employ measures beyond a typical *Terry* stop, including handcuffing and secluding the suspects. *See Mitchell*, 80 Wn. App. at 145-46. Because Officer Clark's actions did not exceed the permissible scope of a valid investigatory stop, the trial court did not err in denying Alexander's motion to suppress the evidence later found in the Durango.

B.      ADDITIONAL JURY INSTRUCTION ON SELF DEFENSE

Alexander argues that the trial court failed to properly instruct the jury on self-defense when it declined to provide his additional jury instruction during deliberation. We disagree.

Whether to provide further instruction to the jury after it has begun deliberations is within the trial court's discretion. *State v. Ng*, 110 Wn.2d 32, 42, 750 P.2d 632 (1988). "Where the decision or order of the trial court is a matter of discretion, it will not be disturbed on review except on a clear showing of abuse of discretion."[9] *In re Parentage of T.W.J.*, 193 Wn. App. 1, 6, 367 P.3d 607 (2016) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). A trial court abuses its discretion if its decision is manifestly unreasonable or based upon untenable grounds. *Kreidler v. Cascade Nat'l. Ins. Co.*, 179 Wn. App. 851, 861, 321 P.3d 281 (2014). A trial court's decision is manifestly unreasonable if it falls " 'outside the range of acceptable choices, given the facts and the applicable legal standard.' " *Id.* (quoting *In re Marriage of Fiorito*, 112 Wn. App. 657, 664, 50 P.3d 298 (2002)).

Here, the jury submitted a question to the trial court after it began deliberations. In response, Alexander asked the trial court to either instruct the jury to read the jury instructions that they had been provided, or to provide his proposed supplemental instruction. The trial court instructed the jury to read the provided instructions on self-defense. Thus, the trial court granted Alexander the relief he requested and Alexander may not assign error on this basis. *See* RAP 3.1.

C.    STATEMENT OF ADDITIONAL GROUNDS

Alexander asks this court to review whether Officer Clark's reasonable suspicion justifying a *Terry* stop of the Durango was based on specific and articulable facts connecting the Durango to the shooting. As discussed above, based on the totality of the circumstances, Officer Clark had a

---

[9] Alexander contends that the applicable standard of review is de novo based on case law addressing challenges to jury instructions. Because he assigns error to the trial court's failure to provide the jury an instruction after the jury began deliberating, the appropriate standard of review is abuse of discretion. *Ng*, 110 Wn.2d at 42.

reasonable basis to suspect that the Durango was involved in the shooting and his stop did not exceed the permissible scope of a *Terry* stop. *Supra*, section A.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____, A.C.J.
Lee, A.C.J.

I concur:

_____, J.
Bjorgen, J.

No. 49924-0-II

MELNICK, J. — (concurrence) I generally agree with the majority opinion, but write separately to emphasize that even if the firearm had been suppressed, there is overwhelming evidence of Leshaun Ayatta Alexander, Jr.'s guilt.

The test for constitutional harmless error is that the court must be able to believe any error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *State v. Barry*, 183 Wn.2d 297, 302–03, 352 P.3d 161 (2015). If overwhelming evidence of the defendant's guilt exists, untainted by error, it is harmless. *Barry*, 183 Wn.2d at 303. The State has the burden of demonstrating harmlessness. *Barry*, 183 Wn.2d at 303.

Here, the record contains overwhelming evidence of Alexander's guilt, even if the firearm had not been admitted into evidence.

Melnick, J.

13