[No. 3641-2. Division Two. December 13, 1979.]

THE STATE OF WASHINGTON, *Respondent*, v. JEROME WALKER, *Appellant*.

*Ted W. Fredericks,* for appellant.

*Don Herron, Prosecuting Attorney,* and *Joseph D. Mladinov, Senior Deputy,* for respondent.

REED, A.C.J.—Defendant Jerome Walker appeals his second-degree burglary conviction. The sole issue is whether defendant's confession and evidence seized from his person after his arrest should have been suppressed. We affirm.

The facts leading to defendant's arrest and subsequent conviction are best summarized by quoting from the trial court's exhaustive suppression hearing findings of fact, which are as follows:

I

At about 10:30 a.m. on June 1, 1978, Mrs. Gerda Boze of 3345 South Alaska Street, Tacoma, Washington, was working in her yard. She observed a black man walk past her on the sidewalk and testified it was unusual to observe a black man in her neighborhood. A few minutes later her elderly neighbor, Mr. Underwood, observed a black man running from the Boze residence carrying a paper sack, and running down the alley and over the fence which borders Interstate Highway # 5. He alerted Mrs. Boze who checked her house and found her black purse missing. It had contained about $300 in currency, miscellaneous papers, and a smaller black vinyl purse which had a substantial amount of change from Mrs.

Boze's employment as a waitress. Mrs. Boze called the police and reported the crime.

## II

At 10:42 a.m. on June 1, 1978, Tacoma Police Department Officer Darland, a uniformed officer, who was working in a marked police car in South Tacoma heard a radio dispatch regarding the burglary and began driving towards the Boze address. The dispatch described the suspect as a dark, possibly black male fleeing on foot towards the freeway. A minute or two later a description of tan pants, brown shirt, possibly wearing glasses, was broadcast along with a black purse with initials G.E.Z. containing a substantial amount of currency, and a brown paper bag. Officer Darland began looking for suspects on foot when he approached the area of 48th and Alaska Streets. He heard a further radio dispatch that a jogger coming off of the east side of the foot bridge over I–5 had been contacted and he reported that a black male was in the area of Titus Will Ford, west of the foot bridge. Officer Darland proceeded to 38th and Alaska and turned west bound over the freeway. At this point he had seen no possible suspects on foot, also he believed other units to have been in the area of the crime and east of that area with no other possible suspects sighted.

## III

When Officer Darland went over the freeway overpass he observed the defendant on foot, just south of Titus Will Ford. Due to the limited access he proceeded to 38th and Steele Streets and back around on Sprague Street. When he rounded the corner he pulled across the oncoming traffic lane to the area of the sidewalk where the defendant approached. There were no other black or dark males in view in the area. The defendant hesitated, then glanced away to the right. That area was bounded by a chain link fence. He then started to walk past the police car. Officer Darland exited the car and approached the defendant. This was at 10:50 or 10:51 a.m.

## IV

The defendant is a black male and was wearing pale blue jeans and a green T shirt with narrow yellow and brown stripes. He had a black vinyl pouch in his right hand and some folded currency in his left hand, one or two folded bills of undetermined denomination. Officer Darland asked to talk with defendant, explaining that a

burglary had just occurred across the freeway. He asked defendant his name, to which the defendant replied Michael Ramsey. He asked for identification and the defendant had none. The defendant volunteered that he was just walking. Officer Darland asked the defendant to remain to see whether he could be eliminated as a suspect in the crime. He asked the defendant to put his hands on the car and patted him down to check him for weapons before having a seat in the rear of his patrol car. He also asked defendant what was in the pouch which had a noticeable bulge, to which the defendant replied "change." Officer Darland asked to see it and when the defendant gave it to him opened it and looked inside, noting that it did contain change and in particular an old standing Liberty half dollar. Officer Darland could no longer see the folded currency which had been in the defendant's hand, and the only commercial business close by was the Titus Ford dealership. Officer Darland thought it was unusual for a person to be walking in that area with currency in their hands.

V

Officer Darland, who has six years' experience as a police patrol officer, testified that he considered the defendant a possible suspect in the crime, and that it is a Tacoma Police Department policy to frisk possible suspects before they are placed in the rear of a patrol car. Officer Darland also testified this is particularly his policy since having a knife held to his throat by a person placed in the rear seat of his patrol car in 1977. Officer Darland asked the defendant to have a seat in the rear of his car, obtained a date of birth from the defendant and requested a record's check by radio from his department and inquired if officers at the crime scene could bring the victim to his location. After further conversation with the defendant, he closed the rear door to the patrol car. At no time did the defendant request to leave or object to sitting in the patrol car. He did state that he had nothing to do with any burglary.

VI

Within a few minutes Mrs. Boze was transported to the scene and after stating she thought the defendant was the one who passed her, positively identified the vinyl pouch as hers and as having been in her purse prior to the burglary. At 10:58 a.m. Officer Darland removed

the defendant from the patrol car, handcuffed him, advised him he was under arrest for burglary and advised him of his Miranda Rights which the defendant stated he understood.

## VII

The defendant was transported to the Tacoma Police Department. Before removing the defendant from the patrol car Officer Darland checked under the rear seat, finding two torn halves of dollar bills and an earring which were subsequently identified as the victim's. No one else had been in the rear seat which Officer Darland had checked prior to starting his shift that day. Later, the defendant admitted to his true name, Jerome Walker. When booked into jail, some $250.00 currency was found in the defendant's undershorts. The defendant denied knowing the origin of the money.

## VIII

At 3:30 p.m. the same day defendant was interviewed in the jail by Investigator Higgins. He was readvised of his Miranda Rights which he stated he understood. After brief questioning, Walker admitted that he had entered the Boze residence, placed the purse in a paper sack and fled to the point where he was arrested.

■ Defendant's contention is that Officer Darland's initial stop and interrogation were based on mere hunch or instinct and were therefore unlawful, citing *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). We disagree. The rule is that an officer having a well founded suspicion of criminal activity, not amounting to probable cause to arrest, and based on articulable objective facts or circumstances may lawfully stop and detain a person for investigative purposes. *State v. Gluck,* 83 Wn.2d 424, 518 P.2d 703 (1974); *State v. Thompson,* 24 Wn. App. 321, 601 P.2d 1284 (1979); *State v. Clark,* 13 Wn. App. 21, 533 P.2d 387, *review denied,* 85 Wn.2d 1018 (1975); *State v. Sinclair,* 11 Wn. App. 523, 529, 523 P.2d 1209 (1974).

Assuming Officer Darland did not have probable cause to arrest defendant when he first observed him, the information he had received via radio, coupled with defendant's physical appearance, his proximity to the crime scene, his possession of the black purselike object, and the presence of

loose currency in his hand, clearly gave rise to a reasonable inference—a well founded suspicion—he was the suspect in question. It was therefore entirely reasonable for the officer to temporarily detain him for further investigation which would either clear him of suspicion or provide probable cause for his arrest. *State v. Gluck, supra.*

■ Nor do we believe defendant's detention in the police car for the short time it took for the victim to arrive to identify him was improper. As stated in *State v. Watson,* 165 Conn. 577, 585, 345 A.2d 532, 537 (1973):

> The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.

The total time elapsed from the initial stop until arrest was only 8 minutes. In these circumstances we think the officer's actions were entirely consistent with good police practice and common sense. We see nothing arbitrary or abusive about the procedures followed. As we said in *State v. Serrano,* 14 Wn. App. 462, 465–66, 544 P.2d 101 (1975):

> Balanced against this [the right of the people to be secure against unreasonable searches and seizures] is the public's interest in effective police protection that will justify certain kinds of warrantless searches and intrusions against the person. . . . Within the constitutional mandate, it is beyond question that "the right to stop, question and detain is vital to the detection of crime in our modern urban communities . . ." *United States v. Thomas,* 250 F. Supp. 771, 790 (S.D.N.Y. 1966). A temporary detention is justifiable under suspicious circumstances, to enable the policeman to determine whether to make an arrest, investigate further, or take no action if satisfied with the explanation given.

*See also* 3 W. LaFave, *Search and Seizure* § 9.2 (1978).

Judgment affirmed.

PETRIE and SOULE, JJ., concur.

Reconsideration denied January 9, 1980.

Review denied by Supreme Court March 7, 1980.