[No. 52679-6.   En Banc.   June 4, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. KEITH BRYAN WHEELER, *Petitioner.*

*Paris K. Kallas* of *Washington Appellate Defender Association,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Deborah J. Phillips, Senior Appellate Attorney,* for respondent.

DOLLIVER, J.—Defendant challenges a Court of Appeals decision affirming his conviction for second degree burglary. We affirm.

On October 7, 1981, during the afternoon, two residents of Cloverdale Street in Seattle called 911 to report suspicious circumstances. The first caller, Beatrice Snyder, reported seeing a man walk by twice as if he were "checking out" a nearby house. A short time later, the man returned with a second man in a green and white car. Snyder watched the two park the car, get out, and dart into a neighbor's yard. The second caller, Mary Grace Dahlen, reported at about the same time seeing a man run past her window. As he ran, the man tossed a pair of gloves into the yard and threw his jacket into a garbage can. He was wearing a bright blue shirt with white stripes.

Seattle police officers Donald R. Smith and Tim Louis Moellendorf received this information and a description of the two suspects over the police radio. They were advised there was a burglary in progress. When the officers arrived at the scene, a witness told them one of the suspects was a few blocks away on Rainier Avenue. The officers drove the indicated distance and saw a man, later identified as the defendant in this case, Keith Bryan Wheeler, wearing a bright blue shirt with white stripes. The man was sweating

and out of breath, as if he had been running.

The officers asked Wheeler no questions except his name. They told him he was being held in custody on suspicion of burglary. The officers frisked him and found nothing. They handcuffed him and placed him in the patrol car. They then drove him the two blocks back to Cloverdale Street, where Dahlen identified him as the man she saw outside her window. The time from detention to identification was from 5 to 10 minutes. The officers learned upon return to the scene that a burglary had in fact taken place at the Aquino residence, next door to the Dahlen residence on Cloverdale. Wheeler was then arrested and informed of his rights.

Other officers who had remained on the scene arrested Tony Smith, driver of the green and white car, as he attempted to leave. The officers found various items stacked up by the door of the Aquino house as if to be picked up. Although the owner of the house indicated numerous items were missing, none of the items were found in Wheeler's possession.

The following day, Detective P. L. Hill approached Wheeler in jail and again advised him of his *Miranda* rights. Wheeler stated he understood his rights and refused to waive them. Hill then began to complete a Personal Investigation Report, telling Wheeler the information was necessary for arraignment. During the course of this questioning, Hill asked Wheeler if he knew Tony Smith. Wheeler denied knowing Smith. Hill knew the information was not necessary to fill out the report. After completing the report, Hill asked Wheeler whether he would make a statement and he refused.

Both Wheeler and Smith were charged with second degree burglary. The two cases were severed for trial. Wheeler's motions to suppress the eyewitness identification and the clothing he was wearing at the time of the arrest were denied.

During the first morning of the jury trial, Wheeler left the courtroom to go to the restroom and never returned.

The trial continued in his absence. The trial court instructed the jury on the elements of second degree burglary and the lesser included offenses of attempted burglary and criminal trespass. Over defense counsel's objection, the court also cautioned the jury not to draw any adverse inferences from Wheeler's failure to testify. The jury returned a guilty verdict.

Sentencing occurred approximately 1 year later, when Wheeler was back in custody. The judge imposed a 10-year sentence. At the same time, the court also revoked Wheeler's suspended sentence and probation in two prior convictions because of the burglary conviction and because he had left the burglary trial.

The Court of Appeals affirmed in a 2-to-1 decision. *State v. Wheeler*, 43 Wn. App. 191, 716 P.2d 902 (1986). Wheeler's petition for review was granted by this court. Three issues are presented for review: (1) whether the police exceeded the permissible scope of conduct during a *Terry* stop of defendant under either the Fourth Amendment or Const. art. 1, § 7; (2) whether the trial court erred by admitting a statement made by defendant in response to questioning on his Personal Investigation Report; and (3) whether the giving of a cautionary instruction, over the objection of defense counsel, that the jury was not to consider the fact that defendant failed to testify in reaching its verdict was in error.

I

Defendant concedes the police had sufficient grounds for an investigative detention, or *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Nevertheless, defendant contends the investigation methods used exceeded the scope of a *Terry* stop and therefore the evidence obtained after his detention was improperly admitted.

The State concedes there was no probable cause for arrest at the time of the initial detention, but argues no arrest was made until after the eyewitness identification.

The State contends the police conduct prior to the formal arrest was all within the permissible scope of a *Terry* stop.

In *State v. Williams,* 102 Wn.2d 733, 689 P.2d 1065 (1984), we enunciated three factors to be considered in determining whether an intrusion on an individual is permissible under *Terry* or must be supported by probable cause: (1) the purpose of the stop; (2) the amount of physical intrusion upon the suspect's liberty; and (3) the length of time the suspect is detained. *State v. Williams,* at 740. Further, the degree of intrusion must also be appropriate to the type of crime under investigation and to the probable dangerousness of the suspect. *State v. Williams,* at 740.

The purpose of a stop must be related to an investigation focused on the defendant. *State v. Williams,* at 740–41. At the time of the stop, the officers had been informed by police radio that a burglary was in progress and given an identification which matched that of defendant. Although the officers asked no other information of defendant, except his name, after the frisk (which revealed no weapon), he was immediately handcuffed, placed in the backseat of the patrol car, and transported a few blocks to the scene of the crime.

We agree with the Court of Appeals that the amount of physical intrusion in the present case was "significant". *State v. Wheeler, supra* at 197. We also concur with the Court of Appeals that the degree of intrusion was not excessive and was permissible under a *Terry* stop. There was no violation of either the Fourth Amendment or Const. art. 1, § 7.

First, as the Court of Appeals points out, the purpose of stopping Wheeler was to detain a person whose description specifically matched that of a witness to several suspicious activities. This is in marked contrast to *Williams* where no investigation had been focused on the person detained.

Second, we agree with the Court of Appeals that frisking and handcuffing defendant for the 2–block ride back to the scene of the burglary was not impermissibly intrusive. While in *State v. Williams, supra* at 740 n.2, the

court stated that in the context of a *Terry* stop "[d]rawn guns and handcuffs, generally, are permissible only when the police have a legitimate fear of danger", the circumstances here were such as to justify handcuffing and placing defendant in the backseat of the patrol car. Such actions are standard, and we believe appropriate, procedures with the Seattle Police Department when a suspect is confined in a police car. Furthermore, the police car here had no screen separating the front and back seats. Given the legitimate concern for police safety when a suspect is being transported in a police car, the actions of the police were consistent with good police practice and common sense. *State v. Walker,* 24 Wn. App. 823, 828, 604 P.2d 514 (1979), *review denied,* 93 Wn.2d 1017 (1980).

Finally, courts disagree as to whether transporting a suspect away from the place the suspect is stopped necessarily transforms a *Terry* stop into an arrest. Many courts, including the Washington Court of Appeals, have concluded it is reasonable to transport a suspect a short distance in order for a witness to make an identification. *State v. Gardner,* 28 Wn. App. 721, 626 P.2d 56, *review denied,* 95 Wn.2d 1027 (1981) (suspect driven six blocks). Many of these cases, however, have involved some additional factor making transportation acceptable. *See, e.g., State v. Bell,* 395 So. 2d 805 (La. 1981); *Wilkerson v. United States,* 427 A.2d 923 (defendants consented to the transportation), *cert. denied,* 454 U.S. 852 (1981); *People v. Lippert,* 89 Ill. 2d 171, 432 N.E.2d 605 (probable cause already satisfied), *cert. denied,* 459 U.S. 841 (1982). Other courts have prohibited virtually any transportation without probable cause for arrest. *People v. Cobbin,* 692 P.2d 1069 (Colo. 1984); *People v. Harris,* 15 Cal. 3d 384, 391, 540 P.2d 632, 124 Cal. Rptr. 536 (1975), *cert. denied,* 425 U.S. 934 (1976).

■ Professor LaFave proposes a middle ground between forbidding any transportation during a *Terry* stop and allowing it freely:

More appealing is the conclusion that because transportation of the suspect even a short distance is more intru-

sive than a mere stop, it "should be dependent upon knowledge that a crime has been committed" and impermissible when the defendant's conduct was suspicious but "there has not been any report of a crime" recently in the vicinity.

(Footnotes omitted.) 3 W. LaFave, *Search and Seizure* § 9.2, at 26 (Supp. 1986).

We believe this is a reasonable and appropriate way to resolve the question of transportation during a *Terry* stop. The facts of this case meet the test: a crime had been reported; a suspect had been stopped; the transportation was for a short distance; the total detention was for but a brief time—no more than 5 to 10 minutes. Given the circumstances of the case, we do not think it was unreasonable for the officers to ask no more questions of defendant but his name, to inform him of the purpose of the stop, to handcuff him for their own security and safety, and to transport him to the site of the reported crime. The scope of the *Terry* stop was not exceeded; neither the Fourth Amendment nor Const. art. 1, § 7 was violated; there was no error.

## II

Defendant contends the trial court erred by admitting the question by Detective Hill regarding his acquaintance with the codefendant Smith. Defendant argues the question violated his right to remain silent since he had already indicated his intent to refuse to make a statement. The State asserts the statement by defendant denying he knew Smith was made freely and voluntarily. At no time after receiving the *Miranda* warnings did defendant request an attorney, so the defendant's right to counsel is not disputed.

When an individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona,* 384 U.S. 436, 473–74, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). The right to remain silent may be waived if the State proves by a preponderance of

the evidence the waiver was knowing, voluntary, and an intelligent relinquishment of a known right. *State v. Robtoy*, 98 Wn.2d 30, 36, 653 P.2d 284 (1982). A waiver of a *Miranda* right need not be explicit but may be inferred from particular facts and circumstances. *North Carolina v. Butler*, 441 U.S. 369, 373, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979). A waiver may be found when defendant freely and selectively responds to police questioning after initially asserting *Miranda* rights. *State v. Coles*, 28 Wn. App. 563, 567, 625 P.2d 713 (1981).

In determining the validity of a waiver of a previously asserted right to remain silent, the court may consider as relevant factors: (1) whether the right to cut off questioning was scrupulously honored; (2) whether the police engaged in further words or actions amounting to interrogation before obtaining a waiver; (3) whether the police engaged in tactics tending to coerce the suspect to change his mind; and (4) whether the subsequent waiver was knowing and voluntary. *See State v. Robtoy, supra* at 37 n.1.

Courts have recognized that the asking of routine questions during the booking process does not generally violate the prohibition against interrogation found in *Miranda* and *Rhode Island v. Innis*, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). *United States v. Menichino*, 497 F.2d 935, 941 (5th Cir. 1974); 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.7, at 504 (1984). An exception for routine booking procedures arises because the questions asked rarely elicit an incriminating response. *United States v. Booth*, 669 F.2d 1231, 1237–38 (9th Cir. 1981); *United States v. Mata–Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983).

The limited exception to *Miranda* allowing background, biographical questions necessary to complete booking does not encompass all questions asked during the booking process. *United States v. Downing*, 665 F.2d 404, 406 (1st Cir. 1981); *United States v. Mata–Abundiz, supra; United States v. Hinckley*, 672 F.2d 115 (D.C. Cir. 1982); *see also*

*United States v. Webb*, 755 F.2d 382, 389 (5th Cir. 1985) (question asked "was not a question normally attendant to custody . . ."). As the court stated in *United States v. Booth, supra* at 1238:

> [W]e recognize the potential for abuse by law enforcement officers who might, under the guise of seeking "objective" or "neutral" information, deliberately elicit an incriminating statement from a suspect.

In the present case, Wheeler was twice advised of his *Miranda* rights, acknowledged he understood them, and twice refused to give a statement. Detective Hill then proceeded to fill out a "Personal Investigation Report", and in the course of a series of descriptive and biographical questions asked the question contested here.

The questions contained in the Personal Investigation Report are the kind of routine questions generally permitted. The question asked as to whether defendant knew Tony Smith, however, was not a routine question in the booking process. Detective Hill conceded the question was not necessary to fill out the report. The implication to Wheeler, however, could well have been the opposite, since it was asked along with the other questions. Wheeler again indicated his continuing refusal to make a statement after Detective Hill completed the report questioning. We find the State has not sustained its burden to prove the defendant's right to silence was scrupulously honored, and he voluntarily waived a known right not to answer the question being contested. *See State v. Robtoy, supra.*

■ The issue remains, however, whether the error of the trial court here was harmless beyond a reasonable doubt. *See State v. Jones*, 101 Wn.2d 113, 125, 677 P.2d 131 (1984). In determining whether an error is harmless under the "overwhelming untainted evidence test" adopted in *State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986), the court must determine beyond a reasonable doubt the evidence not tainted by error is, by itself, so overwhelming that it necessarily leads

to a finding of guilt. *Guloy,* at 426. We find under this test the admission of the evidence here was harmless. The overwhelming evidence from the stop itself, the evidence of the burglary, the matching shirt, and the eyewitness identification lead us to conclude the exclusion of this evidence would not have resulted in a different verdict. The trial court's error in admitting the statement was harmless.

## III

Defendant contends the instruction to the jury not to draw any adverse inference from his failure to testify highlighted his absence from the trial. He argues the instruction should not be given unless requested by defense counsel.

■ The United States Supreme Court has ruled this instruction, even given over defense objection, does not violate the Fifth Amendment privilege against self–incrimination as a matter of federal law. *Lakeside v. Oregon,* 435 U.S. 333, 55 L. Ed. 2d 319, 98 S. Ct. 1091 (1978). As to the Washington constitutional provision against self–incrimination, article 1, section 9, we have construed it to be identical in scope to the Fifth Amendment. *State v. Franco,* 96 Wn.2d 816, 829, 639 P.2d 1320 (1982); *State v. Foster,* 91 Wn.2d 466, 473, 589 P.2d 789 (1979). Furthermore, this court has specifically held there is no prejudicial error to give this instruction either on the request of the State or the court's own motion. *State v. Goldstein,* 65 Wn.2d 901, 400 P.2d 368, *cert. denied,* 382 U.S. 895 (1965).

Affirmed.

BRACHTENBACH, ANDERSEN, CALLOW, and DURHAM, JJ., concur.

DORE, J. (concurring)—I do not believe that the United States Supreme Court decision in *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968) justifies Wheeler's original detention. Nevertheless, I concur in the majority's decision to affirm Wheeler's conviction on the basis that the police officer's actions in detaining Wheeler constituted a

valid arrest.[1]

In order to arrest an individual, the police must have probable cause that the individual has committed a crime. In this case, at the time of Wheeler's detention, the officers knew: (1) that a possible burglary had occurred; (2) that there were two suspects who were both black males; (3) and that one of the suspects was wearing a bright blue shirt with stripes. When they arrived at the scene of the burglary, the police met a reporter and he indicated the following:

A [The reporter] stated to me that he had seen a black male wearing a bright blue sweater with stripes on it in this area right here along Rainier Avenue (indicating).
. . .
Q What did you do then in response to that?
A Officer Smith and I at 4608 South Cloverdale got back in our patrol vehicle, drove down Cloverdale to 50th, along 50th to Rainier Place South, then to Rainier Avenue South. We looked up northbound on Rainier, and we saw the person [the reporter] had seen with the bright blue sweater with stripes on it, the black male. He was walking fast on northbound on this side would be the west side of the street in front of this building right here (indicating) which is a restaurant.
Q What did you do then?
A We drove up the sidewalk here (indicating) and stopped this individual at the northeast corner of the building.
Q What was the condition of the individual at that time?
A The man we stopped was sweating very heavily, and he was out of breath.

Verbatim Report of Proceedings, at 67.

I believe these facts constitute probable cause for an arrest, and I would affirm Wheeler's conviction on this basis only.

---

[1]The State has never conceded that Wheeler's original stop was not an arrest. In the suppression hearing, the State argued and the court ruled that the original detention was a valid *Terry* stop, but this court may affirm the order denying the motion to suppress on alternative grounds. *Ertman v. Olympia*, 95 Wn.2d 105, 108, 621 P.2d 724 (1980).

PEARSON, C.J. (dissenting)—I believe the majority's exposition of the *Terry* doctrine contains a significant flaw that renders our interpretation of *Terry* at odds with the interpretation fostered by the Supreme Court. In light of this error and the incorrect conclusion resulting from it, I dissent.

The facts here are not in dispute. Police officers had a reasonable suspicion that petitioner had committed a crime. They stopped petitioner on the street and advised him that he was being held on suspicion of burglary. The officers proceeded to frisk, handcuff, and order petitioner into their patrol car. The officers then transported petitioner several blocks to the scene of the suspected burglary for a witness identification. The total time petitioner was detained was approximately 5 minutes.

The majority holds that the detention and transportation of petitioner was a lawful investigative seizure permitted under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). In so doing, the majority purports to follow *State v. Williams*, 102 Wn.2d 733, 689 P.2d 1065 (1984). In *Williams*, police officers had a reasonable suspicion that Williams had committed a burglary. They stopped Williams' car, ordered the suspect to step out, frisked and handcuffed him, and placed him in a patrol vehicle. This court held that Williams' seizure was unlawful for two reasons. First, when police seized Williams, they did not question him to allow him to explain his presence at the house thought to have been burglarized, but instead utilized the seizure as a sort of "holding action" while they investigated the house. *Williams*, at 740–41. Second, the police did not articulate reasons for believing Williams dangerous, and thus they were not justified in handcuffing him or secluding him in the patrol car. *Williams*, at 740.

The material facts in the instant case are virtually identical to those in *Williams*. Police had a "reasonable suspicion"—the level of proof required under *Terry*—that the suspect had committed a crime. The crime under suspicion in the instant case, as in *Williams*, was burglary. The police

made no inquiries of the suspect in order to elicit some explanation for his presence. In addition, the police articulated no reasons for believing the suspect was dangerous; the handcuffing and seclusion in the police vehicle were routine procedure.

Because the majority has not offered any facts material to the *Terry* doctrine that would distinguish the instant case from *Williams,* I believe we must hold the seizure here unlawful. However, my dissent in this case is based on more than the court's failure to follow *Williams.* I believe the *Terry* doctrine as espoused by the United States Supreme Court would not permit a seizure such as the one here, for two reasons. First, the Court would not consider the seizure a species of *Terry* stop, regardless of the circumstances of the particular case. Second, even if the seizure were of a type permitted under *Terry,* the Court would find that the scope of the seizure was excessive in light of the particular facts known to the police. These two distinct issues—the *type* of seizure in general permitted under *Terry* and the *relation* between the seizure and the particular circumstances of the case—are best explained through a recapitulation of the *Terry* doctrine.

I

*Terry v. Ohio, supra,* established that although the Fourth Amendment applies to all seizures of the person, including relatively minor ones, not all seizures require the same level of proof. Seizures that are as intrusive as arrests require the traditional probable cause; however, certain relatively unintrusive seizures, such as brief on–the–street investigatory stops, may be justified by a lesser standard of proof. *Terry,* 392 U.S. at 21–22. This lesser standard, the "reasonable suspicion" standard, is satisfied when officers can point to "specific and articulable facts" which warrant a belief that the suspect is or has been engaged in crime. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 880–81, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975); *Terry v. Ohio, supra,* at 21–22, 28; *see also United States v. Hensley,* 469 U.S.

221, 227, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985).

Thus, when the State seeks to justify a *Terry* stop, it first must establish that the investigating officers had a reasonable suspicion of criminal activity and that the seizure at issue falls within the general class of relatively unintrusive measures. Once these two prerequisites have been met, the *Terry* "balancing test" is called into play. The balancing test requires weighing the governmental interest in the particular seizure before the court against the intrusiveness of that seizure on the privacy rights of the individual. *Dunaway v. New York,* 442 U.S. 200, 209–10, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979). The examination of the governmental interest involves a determination of whether the police acted reasonably and with diligence in their choice of investigatory procedures. *United States v. Sharpe,* 470 U.S. 675, 686–87, 84 L. Ed 2d 605, 105 S. Ct. 1568 (1985).

The *Terry* inquiry, then, is essentially a four–step one:

1. *Was there a "seizure"* as that term was intended in the Fourth Amendment—that is, was there a forcible detention as opposed to, for example, a consensual encounter? *See Florida v. Royer,* 460 U.S. 491, 497–98, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983) (plurality opinion); *Terry,* 392 U.S. at 16.

2. *Did the seizing officer have a reasonable suspicion of criminal activity?* Without this minimum amount of proof, no forcible stop is justifiable. *See United States v. Brignoni–Ponce, supra.*

3. *Did the seizure fall within the class of limited intrusions that can be justified without probable cause? See United States v. Place,* 462 U.S. 696, 708–09, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983); and

4. If the preceding requirements have been met, *did the governmental interest justify the scope of even the limited intrusion, in light of the particular circumstances of the case? See United States v. Sharpe, supra; see generally Michigan v. Summers,* 452 U.S. 692, 696–700, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981).

The error in the majority's analysis is its coalescence of

steps 3 and 4 of this inquiry. Although each of these two steps focuses on the intrusiveness of the seizure, the inquiries are different. The inquiry in step 3 is whether the seizure is an investigative stop as opposed to a full–scale arrest, for a full–scale arrest can never be supported by less than probable cause. *See Dunaway,* 442 U.S. at 216. The inquiry in step 4 is whether, assuming that the seizure is sufficiently limited to be classified as a stop, the nature and extent of the stop were justified by the governmental interests served by the seizure: that is, did the police act in a reasonable manner in their choice of investigatory procedures? *See Sharpe,* 470 U.S. at 686–87.

Perhaps the clearest way to understand the *Terry* analysis is to note that steps 1 through 3 comprise the preliminary question, "Is this a *Terry* stop?", and step 4 then asks, "Given that this type of seizure meets the minimum requirements for a *Terry* stop, *was this particular seizure a reasonable intrusion in light of the circumstances at the time*?" Thus, for example, assume *Terry* would allow police officers to detain an airport passenger's luggage and send it several miles away to be sniffed by a narcotics detection dog, even though the procedure would take more than an hour. Suppose the police in a particular case had several hours' notice that a suspect would be arriving at the airport, and the officers easily could have arranged to bring the dog to the airport prior to the suspect's arrival. A decision to detain and transport the luggage in lieu of procuring the dog would constitute an unnecessary intrusion in those circumstances and thus would be an unreasonable seizure. *See United States v. Place,* 462 U.S. at 709–10. In other words, even if an intrusion is sufficiently limited to classify as a *Terry* stop, the particular circumstances of a seizure can render the intrusion unjustified. *See United States v. Sharpe,* 470 U.S. at 686–88 (police must use diligence, and investigatory procedures must be reasonable).

This final step in the *Terry* analysis has been referred to as the *Terry* balancing test. *See Dunaway v. New York,* 442 U.S. at 210. It differs from the "intrusion" inquiry in step 3

because step 4 assumes we are already dealing with a limited intrusion and proceeds to focus on whether that *particular* limited intrusion is reasonable in light of the particular circumstances of the case. The balancing test is *not* used to determine in the first instance whether the intrusion is "so substantially less intrusive" than an arrest so as to qualify as a stop. *See Dunaway v. New York, supra.* It cannot be overemphasized that the governmental interests and the diligence and reasonableness of the police, while factors in the step 4 balancing test, carry absolutely no weight in the step 3 inquiry into the limitedness of the intrusion. The step 3 inquiry examines only the intrusiveness of the seizure on the liberty and privacy rights of the suspect.

A survey of the Supreme Court's *Terry* cases demonstrates the continued viability of these two distinct intrusion inquiries. The Court first examines the "limitedness" of the intrusion to see if the seizure can be supported by less than probable cause. Once it decides that the seizure is sufficiently limited to qualify as a *Terry* stop, the Court examines the "reasonableness" of the intrusion in light of the particular law enforcement interests at stake and the choice and intrusiveness of the investigatory methods employed.

*Dunaway v. New York* was one of the first of *Terry*'s progeny to clarify that a seizure cannot be considered an investigatory stop when the intrusiveness of the seizure is "in important respects indistinguishable from [the intrusiveness of] a traditional arrest." *Dunaway v. New York,* 442 U.S. at 212. In *Dunaway,* police officers had a reasonable suspicion that the defendant had participated in an attempted robbery which had resulted in a killing. The officers located the defendant at a neighbor's house and ordered him to get into their police vehicle. The officers then took the defendant to the police station and placed him in an interrogation room. Although the suspect was not physically restrained, he would have been restrained had he attempted to leave. The defendant was not told he was

under arrest, nor was he booked. *Dunaway,* 442 U.S. at 212.

The Court in *Dunaway* recognized that the seizure was merely an investigatory measure and was not necessarily intended as a prelude to the filing of formal charges. *See Dunaway v. New York, supra.* The Court held, however, that the seizure still could not be justified on less than probable cause because the intrusion on the individual's liberty was substantial. *Dunaway,* at 212–13, 216. The defendant's seizure was not "even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny." *Dunaway,* at 213. *Terry* carved out an exception to the general Fourth Amendment rule that searches and seizures be based on probable cause. If the Court were to permit a seizure as intrusive as the one in *Dunaway* to fall within the *Terry* exception, the exception then "would threaten to swallow [that] general rule". *Dunaway,* at 213.

The State's argument in *Dunaway* essentially was that step 3 in the *Terry* analysis be discarded whenever a seizure falls short of a technical arrest. *See Dunaway,* at 213. The legality of the seizure would be determined through the use of the balancing test. The Supreme Court, however, expressly rejected this approach.

> [T]he protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the "often competitive enterprise of ferreting out crime." A single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.

(Citation omitted.) *Dunaway,* at 213–14.

The *Terry* balancing test thus comes into play only when we are dealing with "narrowly defined intrusions". *Dunaway,* at 214. Once we have determined an intrusion is limited in nature, we may proceed to balance "the limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the

police officer's safety." (Citation omitted.) *Dunaway,* at 209. But when the intrusion is substantial, "the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause." *Dunaway,* at 214.

In deciding that the suspect's seizure was substantially as intrusive as an arrest, the *Dunaway* Court considered the facts that the suspect was not questioned at the location where he was initially stopped but instead was transported in a police car to the police station, where he was confined in an interrogation room. *Dunaway,* at 212. Such a seizure was not "even roughly analogous" to the limited intrusion sanctioned in *Terry* and its offspring. *Dunaway,* at 213.

*Dunaway*'s limitation on the application of the *Terry* balancing test was reenforced several years later in *Michigan v. Summers,* 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981). In *Summers,* police officers about to execute a search warrant on a suspect's home encountered the suspect descending the front steps. The officers detained the suspect inside the house during the course of the search. The issue before the Court was whether the detention was lawful absent probable cause. The Court recapitulated *Dunaway*'s reasoning and its conclusion that the *Terry* balancing test applies only to intrusions on personal privacy that are "so much less severe" than the intrusions of traditional arrests. *Summers,* at 696–98 (citing *Dunaway,* 442 U.S. at 209). Before it could decide whether to follow the *Terry* standard or the general probable cause standard for assessing the lawfulness of the detention, the Court had to determine whether the detention was "substantially less intrusive" than the traditional arrest. *Summers,* at 701–02 (quoting *Dunaway,* 442 U.S. at 210).

The factors the Court considered in deciding that the detention in *Summers* was substantially less intrusive than an arrest were that the detention took place inside a home and that the home belonged to the person being detained. "[B]ecause the detention . . . was in [the suspect's] own

residence, it could add only minimally to the public stigma associated with the search itself". *Summers,* at 702. The search had already been authorized by a warrant and thus presented no Fourth Amendment problem, and although detention during the search was "a significant restraint on [the suspect's] liberty," it was not of a type that most citizens would find overly intrusive. *See Summers,* at 701.

One of the next *Terry* cases to illustrate the distinction between the two intrusion inquiries was *Florida v. Royer,* 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983). In *Royer,* detectives investigating narcotics trafficking at Miami Airport developed a reasonable suspicion that the defendant was carrying contraband in his luggage. *Royer,* at 502. After talking briefly with the defendant and examining his airline ticket and baggage identification, the detectives retained the ticket and identification and asked the suspect to accompany them. The detectives led the suspect to a small room in the flight attendants' lounge approximately 40 feet from the spot on the concourse where the suspect initially had been stopped. Once inside the room, the detectives asked the suspect if he would consent to a search of his luggage. *Royer,* at 494.

In a portion of the plurality opinion reflecting the view of five of the justices, the Court held that at the time the detectives requested consent to search the luggage "the detention to which [the suspect] was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." *Royer,* at 502; *see also Royer,* at 501; *Royer,* at 509 (Brennan, J., concurring in the result). The fact that the detectives retained the suspect's ticket and luggage, combined with the officers' removal of the suspect from a "public place", led the Court to conclude that "[a]s a practical matter, [the suspect] was under arrest." *Royer,* at 503; *see Royer,* at 509 (Brennan, J., concurring in the result).

Although the Court in *Royer* relied on step 3 of the *Terry* analysis by holding that the seizure was too severe to be justified under *Terry, see Royer,* at 503, the Court in

dicta considered step 4: whether, if *Terry had* applied, the seizure would have satisfied the balancing test for reasonableness. *See Royer,* at 504–05. The Court concluded that the seizure would have been unlawful even under *Terry,* for law enforcement interests were not served by removing the suspect from the concourse, *See Royer,* at 505, and the seizure "was more intrusive than necessary". *Royer,* at 504.

It is important to note that with respect to the step 3 inquiry into the "limitedness" of the intrusion, the *Royer* Court did not adopt a per se rule that transporting a suspect from one location to another is too intrusive to be permitted under *Terry.* Bringing a suspect "from an airport concourse to a more private area", for example, can be a limited intrusion in some circumstances. *See Royer,* at 504–05. However, the combination of facts that made the suspect's detention and removal unlawful in *Royer* were (1) the officers' retention of the suspect's airline ticket and baggage identification; (2) the officers' retrieval and retention of the suspect's luggage; (3) the suspect's removal from a public place to confinement in a private room, alone with two officers; and (4) the officers' intention of retaining the luggage until a search warrant could be procured. *Royer,* at 502–03. Arguably, the removal would have been a limited intrusion if the agents had returned the suspect's papers and luggage and then merely questioned him briefly in the room.

In *United States v. Place,* 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983), decided shortly after *Royer,* the Court faced a similar *Terry* situation. In *Place,* Drug Enforcement Administration (DEA) agents received information that a suspect would be arriving at La Guardia Airport carrying narcotics in his luggage. The agents approached the suspect after his arrival, informing him that he was suspected of carrying contraband. After conversing with the defendant and developing a reasonable suspicion he was carrying drugs, the DEA agents seized the luggage and transported it to nearby Kennedy Airport, where the

agents subjected the bags to a "sniff test" by a narcotics detection dog. The dog manifested a positive reaction to one of the bags. The length of time from the initial seizure of the bags until the dog had sniffed them was approximately 90 minutes. *Place,* at 698–99.

The Court in *Place* engaged in both "intrusion" inquiries: first, whether the investigative procedures employed were sufficiently limited to be permissible absent probable cause, *see Place,* at 706–07, 709–10; and second, whether the officers acted diligently in employing those procedures, *see Place,* at 709–10. In the step 3 inquiry, the Court examined two aspects of the luggage seizure: the duration of the seizure and the exposure of the luggage to the narcotics detection dog. The Court concluded that the canine sniff was a species of search "much less intrusive than a typical search" because it "does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage." *Place,* at 707. Thus, such a limited search, like a limited seizure, could be supported by less than probable cause.

Although the Court in *Place* rejected a per se bar to the use of canine detection in *Terry* stops, the Court concluded that the other aspect of the luggage seizure—its duration—failed to fall within the outer perimeter of *Terry* as required by step 3. Here the Court did set a per se rule: a 90–minute detention of an airport passenger's luggage is too long to be a lawful *Terry* seizure, regardless of the law enforcement interests at stake or the diligence of the police. *Place,* at 709 ("The length of the detention of respondent's luggage *alone* precludes the conclusion that the seizure was reasonable in the absence of probable cause."). (Italics mine.) The Court explained:

> Although we have recognized the reasonableness of seizures longer than the momentary ones involved in *Terry, Adams [v. Williams,* 407 U.S. 143 (1972)], and *Brignoni–Ponce* . . . the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in

determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion.

*Place,* at 709. As in *Royer,* the Court in dicta engaged in the step 4 intrusion inquiry and concluded that even if the seizure had been permissible under *Terry,* the agents' failure to act diligently and in a reasonable manner would have rendered the seizure unlawful in any event. *Place,* at 709.

Two of the Court's most recent *Terry* cases, decided on the same day, highlight the distinction between the inquiry into the limitedness of the intrusion and the inquiry into the reasonableness of the intrusion in the particular circumstances of the case. In *United States v. Sharpe,* 470 U.S. 675, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985), the Court's principal concern was with the step 4 inquiry into the reasonableness of the intrusion. In that case, a police officer had stopped a suspect while the latter was driving his pickup truck, and the officer detained the suspect for 20 minutes. The suspect argued that the duration of the stop—like the duration of the stop in *Place*—"alone" precluded justification under *Terry. Sharpe,* at 683; *see Place,* 462 U.S. at 709.

The Court rejected the suspect's contention, although it reaffirmed the principle that *Terry* stops must be limited intrusions. "Obviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Sharpe,* 470 U.S. at 685. But once the Court brushed aside the argument that a detention of 20 minutes duration was impermissible under *Terry,* it abruptly shifted to the reasonableness inquiry, where it refined the test to a question of police diligence and reasonable investigative choices. *Sharpe,* 470 U.S. at 686–87. Despite some language appearing to confuse the step 3 and step 4 inquiries, *see Sharpe,* at 685–86 (examining police diligence in determining limits of *Terry*), the Court in no way suggested that diligence on the part of the police could ever justify a lengthy detention, absent probable cause. *See Sharpe,* at 685.

The *Sharpe* Court did expressly decline to set the outer

limits of a *Terry* stop in terms of duration. *Sharpe,* at 685. The Court's reluctance to "impose [a] rigid time limitation" on *Terry* stops, *Sharpe,* at 685; *see also Place,* 462 U.S. at 709–10, may stem from the fact that duration cannot be looked at apart from other aspects of a stop in determining the limitedness of the intrusion. For example, in terms of intrusiveness, a half–hour detention on a street corner may be tantamount to an arrest, whereas a half–hour detention on the porch of one's own home may be sufficiently limited to be justified on reasonable suspicion. *Cf. Michigan v. Summers, supra,* 452 U.S. at 702 (detention in one's own residence "substantially less intrusive" than more public detention). But whatever the Court's reasoning behind refusing to set an absolute limit on the duration of a *Terry* seizure, the *Sharpe* Court continued to adhere to the two intrusion inquiries, affirming its holdings in *Dunaway, Summers, Royer,* and *Place. See Sharpe,* 470 U.S. at 684–85.

In *Hayes v. Florida,* 470 U.S. 811, 84 L. Ed. 2d 705, 105 S. Ct. 1643 (1985), decided the same day as *Sharpe,* the Court focused on the step 3 inquiry, the question of whether the intrusion was sufficiently less intrusive than an arrest so as to qualify as a *Terry* stop. In *Hayes,* police had reasonable suspicion to believe the defendant had committed a series of burglary–rapes. The officers went to the defendant's home and informed him that if he would not volunteer to return with them to the police station for fingerprinting, they would place him under arrest. The defendant agreed to accompany the officers to the station, where he was fingerprinted.

The Court in *Hayes* held that the defendant's seizure and removal to the police station was too intrusive to be justified absent probable cause. *Hayes,* at 816. The Court engaged in none of the balancing of interests characteristic of the step 4 inquiry, nor did it inquire into the officers' diligence, good faith, or reasonableness in their choice of investigatory procedures. Rather, the Court reaffirmed the holdings of *Dunaway v. New York,* 442 U.S. 200, 60 L. Ed.

2d 824, 99 S. Ct. 2248 (1979) and *Davis v. Mississippi,* 394 U.S. 721, 22 L. Ed. 2d 676, 89 S. Ct 1394 (1969), that "transportation to and investigative detention at [a police] station" cannot be based on the reasonable suspicions of officers in the field. *Hayes,* at 815.

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. *Dunaway,* [442 U.S.] at 212; *Florida* v. *Royer,* 460 U. S. 491, 499 (1983) (plurality opinion). And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.

*Hayes,* at 815–16.

It should be emphasized that such a seizure is unlawful even when the investigative procedure employed at the station house is relatively unintrusive. The Court observed that fingerprinting a suspect "involves neither repeated harassment nor any of the probing into private life and thoughts that often marks interrogation and search, [and it] represents a much less serious intrusion . . . than other types of searches and detentions." *Hayes,* at 814. The removal to the station house, however, "alone" was sufficient to render the defendant's seizure unlawful.

## II

When the 4–step *Terry* analysis is applied to the instant case, the first two steps are unproblematic. No one disputes that the petitioner was "seized" when the officers encountered him, and thus the protections of the Fourth Amendment were triggered. In addition, no one disputes that the officers had a reasonable suspicion that the petitioner was involved in criminal activity. We do, however, disagree as to the step 3 and step 4 inquiries. I cannot concur in the majority's implicit assumption that the intrusion on the

petitioner's liberty was "substantially less intrusive" than an arrest, *see Michigan v. Summers,* 452 U.S. at 702. And even if the intrusion somehow *were* permissible under *Terry*—an assumption I believe is incorrect—the intrusion would fail the step 4 *Terry* inquiry.

The step 3 *Terry* inquiry requires us to examine the nature of the intrusion on the suspect's liberty and privacy interests. The officer's stop of Wheeler had the following attributes: (1) Wheeler was not asked for an explanation for his presence; (2) he was handcuffed; (3) he was placed in a patrol car; (4) he was transported away from the location where he was initially seized; (5) the distance he was taken was several blocks; (6) the duration of the seizure was approximately 5 minutes; and (7) the investigative procedure at the conclusion of the seizure was an eyewitness identification.

The first conclusion we can draw, based on the cases discussed above, is that if Wheeler had been taken to the police station instead of to the crime scene, there would be no question the seizure would have been unlawful. *See Hayes v. Florida, supra; Davis v. Mississippi, supra; Dunaway v. New York, supra.* The fact that Wheeler was not subjected to interrogation at the end of his journey but was merely presented for identification is irrelevant. *See Hayes v. Florida,* 470 U.S. at 814–15 (even though fingerprinting is relatively unintrusive procedure and arguably may be permitted during a *Terry* stop, seriousness of intrusion in bringing suspect to station house for any investigative purpose makes seizure unjustifiable). Moreover, transporting the suspect to a police station is unlawful even if the entire detention is brief. *See Hayes,* at 816.

The Supreme Court also has told us that the intrusiveness in the removal of a suspect is no less in those cases where the police first encounter the suspect somewhere other than at the suspect's home. In *Royer* the suspect was stopped in a public place; in *Hayes,* in his own home; in *Dunaway,* at a neighbor's home. The *Hayes* Court clarified that probable cause is a prerequisite to transporting a sus-

pect to the police station when the suspect is "forcibly remove[d] . . . from his home *or other place in which he is entitled to be*". (Italics mine.) *Hayes,* 470 U.S. at 816.

Nonetheless, the Supreme Court has not ruled out *any* moving of the suspect, *see Florida v. Royer, supra,* 460 U.S. at 504–05 (removal from airport concourse to more private area may in some circumstances be permissible). The difficulty with this issue is that while holding that moving a suspect may in some circumstances be a sufficiently limited intrusion to fall under *Terry,* the Court has yet to uphold an individual instance where police have moved the suspect. *See Hayes v. Florida, supra; Davis v. Mississippi, supra; Florida v. Royer, supra; Dunaway v. New York, supra.* The majority opinion in the instant case cites a number of federal circuit and state court cases holding that a suspect may be handcuffed and transported in a police car under *Terry.* However, in none of the cases cited did the courts use the 4–step analysis or recognize the distinction between the step 3 and step 4 "intrusion" inquiries. Instead, the courts only performed the step 4 inquiry, using the reasonableness of the officers' actions to justify the intrusions. *See Wilkerson v. United States,* 427 A.2d 923 (D.C.), *cert. denied,* 454 U.S. 852 (1981); *People v. Lippert,* 89 Ill. 2d 171, 432 N.E.2d 605, *cert. denied,* 459 U.S. 841 (1982).[2] The Washington cases cited suffer the same defect. *See State v. Gardner,* 28 Wn. App. 721, 626 P.2d 56, *review denied,* 95 Wn.2d 1027 (1981); *State v. Walker,* 24 Wn. App. 823, 604 P.2d 514 (1979), *review denied,* 93 Wn.2d 1017 (1980). One Washington case not cited by the majority, *State v. Hoffpauir,* 44 Wn. App. 195, 722 P.2d 113 (1986), concluded in dicta that involuntary transportation to a witness' home, absent probable cause, would fall squarely within the prohibition of *Davis* and *Hayes. See Hoffpauir,* at 198–99. In any event, although the issue before us is not an entirely novel one, precedent affords lit-

---

[2] In *State v. Bell,* 395 So. 2d 805 (La. 1981), cited by the majority, the defendants "voluntarily" accompanied the officer in his car. *See Bell,* 395 So. 2d at 808.

tle support for the majority's conclusion. In order for us to conclude, then, that police may remove a suspect to somewhere other than a police station, we should satisfy ourselves that the other conditions of the suspect's detention, taken together with the removal, resulted in a seizure that remained "'substantially less intrusive' than an arrest." *See Michigan v. Summers,* 452 U.S. at 702.

In *Florida v. Royer, supra,* the suspect was walked approximately 40 feet away from the public concourse where he was first stopped. The Court seemed concerned with the fact that the place to which he was taken was a room in a private area. Because the distance was small and the Court did not find the duration of the seizure unduly long, I think that the case must be read to hold[3] that the overintrusiveness of the seizure lay in the retention of the suspect's personal property coupled with his involuntary seclusion and confinement. *See Royer,* 460 U.S. at 503 ("What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room . . ."). As noted above, the Court has not upheld the removal of a suspect even when the suspect was not later subjected to interrogation. *See Royer,* 460 U.S. at 503; *see also Hayes v. Florida,* 470 U.S. 811, 814–15, 84 L. Ed. 2d 705, 105 S. Ct. 1643 (1985). The problem in *Royer,* then, was not that the suspect was taken to be interrogated but rather that he was *confined.*[4]

The Supreme Court has not discussed the use of handcuffs in a *Terry* stop. The Court has upheld brief self–pro-

---

[3]As I indicated earlier, although *Florida v. Royer,* 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983) was a 4–justice plurality, a fifth justice concurred in the portions of the plurality opinion discussed here. *See Royer,* at 509 (Brennan, J., concurring).

[4]This is not to say that the difference between interrogation and less intrusive investigatory procedures is irrelevant. *See Michigan v. Summers,* 452 U.S. 692, 702 n.15, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981). However, as far as the intrusiveness of removing and confining a suspect is concerned, such measures in themselves may be too intrusive to qualify under *Terry. See Hayes v. Florida,* 470 U.S. 811, 84 L. Ed. 2d 705, 105 S. Ct. 1643 (1985).

tection measures on the part of officers, such as a patdown, *see Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); requiring a suspect to step out of his vehicle, *see Pennsylvania v. Mimms,* 434 U.S. 106, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977); and an officer drawing his gun, *see United States v. Hensley,* 469 U.S. 221, 235, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985). None of these measures has been more than momentary, however.

Given the Supreme Court's disposition of these *Terry* cases, and the absence of any Supreme Court precedent upholding either handcuffing, confinement in a police vehicle, or transportation, I do not see how we can hold that handcuffing, confinement in a police car, and removal to another location, taken together, are "substantially less intrusive" than the seizures in *Dunaway, Davis, Hayes,* and, most especially, *Royer.* If Mr. Wheeler had been taken to a police station just around the corner from where he had been stopped and held there only briefly, *Hayes* would hold the seizure unlawful.

Even if Supreme Court precedent were not sufficient to persuade the majority that the police measures in this case were severely intrusive, common sense should suffice. Being manacled not only makes a person physically helpless but additionally is an enormously humiliating experience. Being confined in a police vehicle is frightening not only because of the physical restraint but also because police actions within the vehicle are unfettered by the restraining influence of public scrutiny that ordinarily accompanies more public detentions. Finally, involuntary removal without an opportunity to inform one's family or associates and without knowledge of the destination and duration of the detention is necessarily a terrifying event. You do not need to be a historical scholar to recognize that a hallmark of the modern police state has been the sudden abduction of citizens, without probable cause or judicial approval.

The argument has been raised that a suspect may *prefer* to be secluded and confined in a police vehicle rather than endure the notoriety of detention on a public thoroughfare.

Such an argument intimates a suspect impliedly consents to the confinement. The record here offers no indication petitioner was granted any choice in the matter, and he may have preferred having the eyewitness brought to him instead of vice versa. Neither the courts nor the police should presume to be acting on a citizen's behalf in opting for his handcuffing, confinement, and removal in lieu of his remaining where he was initially encountered.

## III

Although the above analysis precludes handcuffing, confinement in a police vehicle, and removal to another location as a lawful investigatory procedure under *Terry*, this interpretation of *Terry* does *not* mean that police may never justifiably perform such procedures following a lawful *Terry* stop. For example, in some cases the suspect may consent to such procedures. In instances where the suspect acts in a menacing manner, police may have probable cause to believe they are about to be assaulted; in such cases probable cause furnishes all the necessary justification for the arrest. *See, e.g., State v. Holeman,* 37 Wn. App. 283, 679 P.2d 422 (1984), *aff'd,* 103 Wn.2d 426, 693 P.2d 89 (1985). Similarly, a suspect's attempt to effectuate an escape would justify an arrest, for the suspect would be interfering with the officer's lawful exercise of his or her authority. *See* RCW 9A.76.020(3).

In addition, handcuffing and seclusion may be lawful if the suspect appears uncontrollable due to intoxication or a mental problem. *See* RCW 70.96A.170; RCW 71.05.150-(4)(b). In such cases the officer would be restraining the suspect for medical and safety purposes and not for prosecution purposes.

Finally, the Supreme Court has left open another possible justification for handcuffing, confining, and transporting a suspect. In *Hayes v. Florida, supra,* the Court suggested that in exigent circumstances the Fourth Amendment might permit bringing a suspect to the police station based only on a reasonable suspicion, provided that the seizure

was authorized by a judge and not merely by a police officer. *Hayes*, 470 U.S. at 817. In such cases the independent and detached judgment of the magistrate would act as a restraint on well-meaning but overzealous officers. *Cf. Dunaway v. New York*, 442 U.S. 200, 213–14, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979) (protections intended by Framers "could all too easily disappear" if *Terry* balancing test applied to all seizures, "especially when [the] balancing [is] done in the first instance by police officers engaged in the 'often competitive enterprise of ferreting out crime.'"). Thus, we cannot rule out recognition of a valid telephone warrant as justification for a seizure such as the one in the instant case.

*Terry* has already given ample room for police self-protection measures such as frisks and drawn guns. *See, e.g., Terry v. Ohio, supra; United States v. Hensley, supra.* The handcuffing and seclusion in this case do not represent new enforcement procedures reasonably required for coping with new types of threats posed in modern times. *Cf. United States v. Skipwith*, 482 F.2d 1272 (5th Cir. 1973) (permitting metal detector searches at airports absent individualized suspicion); *Downing v. Kunzig*, 454 F.2d 1230 (6th Cir. 1972) (holding that threat of bombings at courthouses justify brief baggage inspections). On the contrary, the Framers of our Constitution were well aware of the threat of burglary and the restraint on liberty created by handcuffs and confinement. The Framers decided that in spite of the number of guilty persons going free under the probable cause standard, that standard of proof was the proper balance between law enforcement interests and liberty and privacy interests. The Fourth Amendment was never intended as a guaranty of effective crime prosecution; as Justice Scalia recently observed, "[T]here is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks*, ___ U.S. ___, 94 L. Ed. 2d 347, 107 S. Ct. 1149, 1155 (1987) (holding that probable cause, and not reasonable suspicion, is the level of proof required for the

seizure of objects discovered in plain view). If we were to construe the *Terry* exception to the probable cause requirement broadly enough to allow the seizure in this case, the exception "would threaten to swallow the general rule" that probable cause is ordinarily required. See page 247, quoting *Dunaway v. New York,* 442 U.S. at 213.

## IV

Although the seizure here was not a *Terry* stop, even it if were it would be unlawful. For the handcuffing, confinement, and removal of petitioner fares no better under the step 4 inquiry than under the step 3. Concededly, the law enforcement interest in prosecuting burglaries is great. The question, however, is whether the officers "diligently pursued a means of investigation" that would let them know in short order whether petitioner probably had committed a burglary. *See United States v. Sharpe,* 470 U.S. 675, 686, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985). The test for diligence is not whether the police could have used a less intrusive investigatory procedure but whether—if a less intrusive procedure existed—they acted unreasonably in failing to consider and pursue it. *Sharpe,* at 687. "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second–guessing." *Sharpe,* at 686.

The officers here failed to pursue three alternatives: asking petitioner's consent to being transported, questioning petitioner where he was first detained to allow him to explain his presence, and transporting the witness to petitioner instead of vice versa. Seeking consent creates the possibility no forcible detention will be necessary. Although questioning a suspect may sometimes appear futile because the police seek more objective evidence than a suspect's own statements, the possibility that the suspect can dispel the officer's suspicions should never be overlooked. In some circumstances a suspect may be able to summon a person nearby to corroborate his story. Summary confinement and

removal should never be the first technique employed. *Cf. State v. Williams,* 102 Wn.2d 733, 741, 689 P.2d 1065 (1984) ("Very few, if any, exigent circumstances justify police intrusion on a citizen's privacy without the police immediately ascertaining the suspect's identity, purpose for being in the area, and possible involvement in a crime."). (Footnote omitted.)

Finally, police should always consider bringing witnesses to where the suspect is being held instead of transporting the suspect. Admittedly in some cases this may be impractical, particularly when the witness is an assault or rape victim. However, in many cases witnesses will be more than willing to assist the police; in the instant case, the witnesses appeared eager to cooperate. The consensual transporting of witnesses should always be preferred to the nonconsensual removal of a detainee.

These three alternatives are not measures only hindsight would discover. Rather, they are measures police should routinely consider before other, more intrusive measures.

For these reasons I dissent.

UTTER, J., and CUNNINGHAM, J. Pro Tem., concur with PEARSON, C.J.